DECISION
Plaintiff appeals the 2008-09 real market value of 35 tax accounts located in a planned unit development named Deschutes Landing, located in Bend, Oregon. A trial was held in the Oregon Tax Courtroom, Salem, Oregon on August 31, 2010. Christopher K. Robinson, Attorney at Law, appeared on behalf of Plaintiff. Richard P. Herman (Herman), MAI, SRA, Certified Real Estate Appraiser, testified on behalf of Plaintiff. Laurie E. Craghead, Deschutes County Assistant Legal Counsel, appeared on behalf of Defendant. Todd Straughan (Straughan), Certified Appraiser, testified on behalf of Defendant.
Plaintiff's Exhibit 1 and 2 and Defendant's Exhibits A through F were received without objection.
 I. STATEMENT OF FACTS
There is no dispute with the following subject property overview presented in Herman's appraisal report:
"Development Overview:
 "Deschutes Landing is a luxury class townhome development that is situated along the southerly shoreline of the Deschutes River. The development tract is approximately 6.11 acres in size, of which 2.0 acres has been utilized to accommodate common areas consisting of open space, buffering and a pedestrian path. The tract was divided into 37 homesites with final plat recording occurring in December, 2005. The lot inventory ranges in size from 1,464 square feet to *Page 2 
4,717 square feet, averaging 2,355 square feet. Of the total, 18 lots are located along the Deschutes Riverfront, 10 of which are comparatively larger homesites ranging in size from 3,878 square feet to 4,717 square feet, averaging 4,219 square feet. * * * The (8) remaining Riverfront Lots are comparatively smaller with a size range of 1,464 to 2,182 square feet, averaging 1,767 square feet. This lot category was designed to accommodate `Middle' Units and have a relatively uniform width of 20 feet relative to a depth range of approximately 73 to 111 feet.
 "Vertical Build Overview:
 "The vertical build agenda for Deschutes Landing consists of two and three level wood frame townhomes offering essentially three floor plans. The revised Riverfront `End' Plan is a three bedroom, 3.5 bath unit that has approximately 3,067 square feet of finished living area on two floor levels. Situated between the End Units are `Middle' Units which are a three level floor plan having approximately 2,486 square feet of finished living area. * * * Situated to the east of Theater Drive will be comparatively smaller `Terrace' Plans which have approximately 2,203 to 2,239 square feet of living area and a built-in tandem car garage. At present, four of these units have been completed on Lots 34 through 37[1] that are priced at $699,000 to $799,000. * * * All of the units exhibit Central Oregon Craftsman architecture that is complimented by abundant masonry trim, hardiplank lap siding, metal roof, wood windows, Trex decking and stone paver driveways. * * *.
 "Project Location:
 "The subject development is situated in the heart of the Old Mill District immediately north of Reed Market Road roughly two blocks south of Columbia Street. The former is a primary north/south collector, whereas the latter provides connectivity to Century Drive over the Deschutes River. The development site has approximately 680 feet of frontage along the east side of the Deschutes River and is thus positively influenced by a significant, unique view and recreational amenity. The project is also within walking distance to the Shops at the Old Mill as well as the nearby business park."
(Ptfs Exlat 6-8.)
Herman's appraisal stated that an "As-Is Market Value" as of July 2, 2008, for "30 Finished Lots as Currently Platted" was $4,291,700. (Id at 8.) Herman's appraisal defined *Page 3 
"Market Value — As-Is" as "[a]n estimate of the market value of a property in the property in a condition observed upon inspection and as it physically and legally exists without hypothetical conditions, assumptions, or qualifications, as of the date of inspection." (Id. at 14.) "Market Value" is defined as:
 "The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
 1. buyer and seller are typically motivated;
 2. both parties are well informed or well advised, and acting in what they consider their best interests;
 3. a reasonable time is allowed for exposure in the open market;
 4. payment is made in terms of cash or United States dollars or in terms of financial arrangements comparable thereto; and
 5. the price represents the normal consideration for property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."
(Id. at 13, 14.)
After analyzing sales of "luxury class" residential lots, Herman prepared a "Bend Luxury Class Residential Lot Cost Allocation Summary." (Id. at 85.) Relying on that summary, Herman concluded that the "value" of each type of lot and improvement as of July 2, 2008, was as follows:
 Riverfront Side: $1,273,725
 Riverfront Middle: $1,056,000
 Terrace Side: $716,000
 Terrace Middle: $672,000
 *Page 4 
(Id. at 86.) Straughan testified that Defendant agrees with each of the values determined by Herman as of July 2, 2008, and prior to allocation of value between land and improvements.
The parties differ on the percentage allocation attributable to the land value. Herman concluded that a "lot value allocation of 25 percent would appear to be appropriate." (Id.) Straughan testified that in Defendant's opinion "a 30% land ratio should be used instead of the 25% ratio used in the Herman appraisal." (Def's Ex A at 9.) Straughan testified that "the County's Ratio Exhibit, attached and incorporated by reference herein" supports "the 30% ratio." (Id.)
The parties differ on the subject property's value as of January 1, 2008. Straughan testified that Herman's "values must be time trended backwards (or up) to the January 1, 2008 assessment date, using a-2% per month trend (increasing the value from 7/08 back to 1/08)." (Id.) He testified that in determining the two percent per month trend factor Defendant relied on the "Bratton Report median home price increase/decrease to time trend sales to the January 1st assessment date" and Defendant's sales analysis. (Id. at 7.) Defendant did not offer a copy of the Bratton Report or sales analysis as evidence. Using the Bratton Report, March 2010, Plaintiff questioned Straughan's conclusion that the "values" needed to be increased. (Ptf's Ex 2.) In its cross-examination, Plaintiff pointed out that for the "Bend area SFR — Median Price in THOUSANDS" decreased slightly from January 2008 ($318) to June 2008 ($315) whereas the "Bend area SFR — Median Sales Price per SF" actually increased from January 2008 ($159) to June 2008 ($166). (Id.) Plaintiff concluded that a trend adjustment is not required.
Herman determined the subject property's "market value of the lot inventory to a single purchaser," using a "Cash Flow Model." (Ptf's Ex 1 at 86, 87.) He stated that the "Cash Flow Model reflects deductions and discounts for unearned profit specifically attributable to the *Page 5 
subject lot inventory together with costs of disposition and property taxes levied during vertical build sell-out." (Id. at 87.) Herman concluded that "[t]he present value of allocated lot sale revenues, and the as-is market value of the subject property, has therefore been calculated at $4,291,700." (Id.) Straughan testified that "the county has to value each individual lot" because the development "is not platted as three or four attached lots." He testified that the "highest and best use" that is "legally permissible" is "single family attached housing." Herman testified that it is "not practical" to value based on "single lot sales;" this is a "planned development" that is "designed for this vertical build out." The parties agree that the "Highest and Best Use of the subject properties is as currently platted, individual vacant lots ready for residential development, with services at the curb." (Def's Ex A at 3.)
The improvements located on two tax accounts (commonly referred to as Lots 17 and 18) were 100 percent complete as of January 1, 2008. In valuing those two accounts, Straughan testified that he relied on the sale of an "identical" property identified as Lot 16: "This is the same model [Lot 18] (riverfront side) as lot 16 that sold four months after the assessment date for $1,189,000." (Id. at 8.) Straughan stated, "[t]he appealed lot 18 is appraised in the Herman Appraisal at $1,273,725[.]" (Id. at 9.) Defendant's real market value (land and improvements) for tax Lots 17 and 18 are $1,182,720 and $1,426,572, respectively. (Id. at 11.) Both values are based on the July 2008 values determined by Herman and "trended at 12%." (Id. at 7.) Plaintiff's real market value Tax Accounts 17 and 18 are $830,000 and $568,425, respectively. (Ptf's Amended Comp at 2.) Plaintiff did not provide evidence to support its values for those tax accounts. *Page 6 
 II. ANALYSIS
At issue in this case is the subject property's real market value for tax year 2008-09. Real market value is defined in ORS 308.205(1)[2]
which reads: "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." There are three methods used to determine real market value: (1) the cost approach, (2) the sales-comparison or comparable sales approach, and (3) the income approach. Allen v. Dept. of Rev., 17 OTR 248,252 (2003). See also OAR 150-308.205-(A)(2) (stating that all three approaches to valuation of real property must be considered, although all three may not be applicable to the valuation of the subject property). The parties did not discuss the cost approach.[3]
A. Comparable Sales Approach
Both parties relied on the comparable sales approach to determine a total land and improvement real market value and an allocation percentage for land to improvement. Defendant accepted Plaintiff's total real market values and adjusted each for time. When a value is determined at a date other than the assessment date, a time adjustment is applied to the determined value to bring that value to the assessment date. Defendant concluded that property values were declining at the rate of two percent per month from January 2008 through June 2008. Unfortunately, Defendant submitted no evidence to support its conclusion. Plaintiff submitted evidence showing that there was little, if any, change in value between January 2008 and July 2008 (the date of Herman's Appraisal). (Ptf's Ex 2.) The court notes that Plaintiff's *Page 7 
evidence related to "median price" and the parties agree that the subject property is best described as "luxury." The court has no evidence to determine whether a time trend adjustment is appropriate for "luxury" properties sold between the assessment date and the date of Herman's appraisal. Based on the lack of evidence, the court concludes that the real market values as of July 2008 were substantially comparable as of the assessment date.
In addition to the time trend adjustment, Defendant determined that the land to improvement allocation ratio should be 30 percent. (Def's Ex B.) Plaintiff determined the allocation ratio to be 25 percent. (Ptf's Ex 1 at 86.) Plaintiff's data in support of its 25 percent allocation factor compared a property's land price to its subsequent sale or listing of land and improvements. (Ptf's Ex 1 at 85.) The sale dates for seven properties ranged from 2006 to early 2008. (Id.) The ratio of land to land and improvement varied from a low of 19.3 percent to a high of 32.2 percent. Nine properties were listed as "active." (Id.) The ratio of land to land and improvement varied from a low of 17.7 percent to a high of 32.6 percent. (Id.) Defendant used the same seven property sales as Plaintiff, except Defendant "time trended the lot" to the sale date of the property when both the land and improvements were sold. (Def's Ex B-1.) Defendant "reconciled" to a 30 percent allocation percentage, concluding that "the nature of trending sales over a long period of time" supported its conclusion. (Id.) The only information provided to the court to evaluate the appropriateness of a time trend adjustment was the Bratton Report. (Ptf's Ex 2.) The Bratton Report supports a conclusion that a time trend adjustment was appropriate for the period 2005 to 2008. Given the evidence submitted to the court, Defendant's 30 percent allocation ratio percentage is accepted.
The parties agree that Lots 34 through Lot 37 were not 100 percent complete as of the assessment date. Plaintiff offered no evidence as to the percent complete for those lots. *Page 8 
Defendant reported that as of the assessment date the developer's representative confirmed that Lots 34 and 35 were 90 percent complete and Lots 36 and 37 were 83 percent complete. Plaintiff has the burden of proof. See ORS 305.427. Having failed to offer any evidence, the court accepts Defendant's report that Lots 34 and 35 were 90 percent complete and Lots 36 and 37 were 83 percent complete.
B. Discounted Cash Flow
Plaintiff alleges that because of its vertical build design the subject property value must be determined using discounted cash flow. The Oregon Supreme Court, in a case with facts[4] similar to those of the matter before the court, concluded that when there is no dispute that the highest and best use of each lot is for the construction of a single-family residence, the property must be valued at its highest and best use to determine the true cash value. First Interstate, 306 Or at 454, citing Sabin v. Dept. of Rev., 270 Or 422, 426-27, 528 P2d 69 (1974). The Court held that using a valuation method that incorporates "[t]he developer's discount does not assess the value of the properties if put to their highest and best use, but reduces their value to arrive at the value of the properties considered as an investment. Investment is not the highest and best use of the properties." First Interstate Bank,306 Or at 455.
In support of its use of the discounted cash flow method, Defendant relies on the court's comment in footnote 2: *Page 9 
 "It is possible that in certain situations, the highest and best use of a lot would be a part of a group of lots. If that were the case, it would be appropriate to assess that lot based on its value as part of a group. That is not the situation in the present case."
Id. at 453 n 2.
In the case before the court, the highest and best use of the subject property is single family residential, not "a part of a group of lots."Id. The property is zoned residential and each lot to date has been constructed for a single family residence. There was no evidence other than Herman's belief that those interested in purchasing the subject property are delayed or constrained by the proposed common wall vertical build design. His belief was not supported by evidence because all sales to date have been to individuals who purchased only one single family lot.
 III. CONCLUSION
After careful review of the testimony and evidence, the court concludes that the real market value of land and improvements for the subject property as of January 1, 2008, was:
 Riverfront Side $1,273,725
 Riverfront Middle $1,056,000
 Terrace Side $716,000
 Terrace Middle $672,000

A time trend factor should not be applied to the real market values set forth above. The land to land and improvement allocation factor is 30 percent.
The real market value of Lots 17 and 18, which were 100 percent complete as of the assessment date, were $1,273,725 and $1,056,000, respectively. A time trend factor should not be applied to the real market values set forth above. The land to land and improvement allocation factor is 30 percent.
Lots 34 and 35 were 90 percent complete and Lots 36 and 37 were 83 percent complete. A time trend factor should not be applied and the land to land and improvement allocation factor *Page 10 
is 30 percent. The real market value of Lots 34 and 37 if improvements were 100 percent complete would be $716,000. The real market value of Lots 35 and 36 if improvements were 100 percent complete would be $672,000. Now, therefore,
IT IS THE DECISION OF THIS COURT that the parties shall determine the real market value of the 35 tax accounts identified as Deschutes Landing on Attachment A as set forth herein for tax year 2008-09.
Dated this ___ day of January 2011.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanner onJanuary 13, 2011. The Court filed and entered this document on January13, 2011.
[1] The parties agree that as of the assessment date, January 1, 2008, Lots 34 through 37 were improved, but not 100 percent complete. Plaintiff offered no testimony as to the percent complete. Defendant's report states that, based on a telephone confirmation with the developer's representative, Lots 34 and 35 were 90 percent complete and Lots 36 and 37 were 83 percent complete. (Def's Ex A at 8.)
[2] All references to the Oregon Revised Statues (ORS) are to 2007.
[3] Herman's Appraisal Report stated that the subject property "was purchased from Riverbend Limited Partnership in April 2005 for a stated consideration of $2,950,000." (Ptf's Ex 1 at 9.) Neither party provided evidence relating the April 2005 purchase price to the assessment date.
[4] The properties that were the subject of that valuation appeal were "lots owned by taxpayer in Spencer's Crest subdivision, which is located on the southern boundary of the City of Eugene in Lane County. Spencer's Crest subdivision was subdivided and platted during the real estate boom of the 1970s. The streets in the subdivision are private, but they are paved and have curbs. There are underground utilities, city water and sewer lines throughout the subdivision.
"Spencer's Crest was planned to contain 38 lots plus three tracts of land. Two of the three tracts were for common use, and the third, Tract C, was intended for the development of condominiums. Each of the lots was to be used for the construction of a single-family residence. The real estate boom collapsed, and by January 1, 1985, the relevant date for the valuation at issue, only six lots had been sold, and the plans for a condominium had been scrapped. Taxpayer had obtained title to the remaining lots and Tract C by deed in lieu of foreclosure." FirstInterstate Bank v. Dept. of Rev. (First Interstate), 306 Or 450, 452,760 P2d 880 (1988).