Samuel E. ALLEN
and Anita M. Allen,
*Plaintiffs,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant,*
*and*

CLACKAMAS COUNTY ASSESSOR,
*Intervenor-Defendant.*

(TC 4571)

Trial was held March 13, 17, and 18, 2003, in the court-room of the Oregon Tax Court, Salem.

David L. Canary, Garvey Shubert and Barer, Portland, argued the cause for Plaintiffs.

Susie L. Huva, Clackamas County Assistant County Counsel, Oregon City, argued the cause for Intervenor-Defendant (the county).

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant (the department).

Decision rendered November 5, 2003.

**HENRY C. BREITHAUPT, Judge.**

## I. INTRODUCTION

Plaintiffs (taxpayers) appeal from a Magistrate Division Decision holding that the real market value (RMV) of taxpayers' property identified as Clackamas County Assessor's Account 00429487 was $8,800,000[1] as of January 1, 2000. Taxpayers maintain the RMV of the property was $3,945,000. Clackamas County (the county) requests the court find the RMV of the property to be $8,294,248.[2]

## II. FACTS

Taxpayers built the subject property, the Monarch Motor Motel (the Monarch) in 1984. It is situated on 4.61 acres of land in close proximity to Sunnyside Road and Interstate 205, 10 miles south of the Portland International Airport. A full-service hotel, the Monarch has 193 guest rooms, an outdoor pool and spa, food service in the form of Sam's Restaurant and Lounge, and a small gift shop. The Monarch has 10 meeting rooms, conference facilities, and a 20,000 square foot convention center. The value of personal property

---

[1] This RMV was without consideration of a significant problem with the property discovered after the Magistrate Decision and before trial here.

[2] Value determined after the agreed upon subtractions for the exterior stucco siding (EIFS) problem, discussed below, and personal property.

at the Monarch, including fixtures, furniture, and equipment, is $530,000.

The Monarch is located in the Sunnyside/Clackamas Town Center area. That area experienced increased development following completion of the Clackamas Town Center regional mall and Interstate 205 in the early 1980s. Those projects spurred residential, office, and smaller scale retail developments that are flourishing.

Several motels are located in the area. The 110-room Days Inn sits on SE Sunnyside Road, the 141-room Best Western Sunnyside Inn sits on SE 97th Avenue, and the 137-room Courtyard Marriot, completed in 1999, flanks the Monarch to the south. Until 1999, there were approximately 490 hotel rooms available in the area, including the Monarch's 193 rooms. In 1999, a total of 287 new rooms were built; the previously noted Courtyard Marriot (137 rooms), the Comfort Suites (50 rooms), and the Oxford Suites (100 rooms). All those motels are considered "limited-service," which indicates they lack amenities of "full-service" hotels such as the Monarch. Limited-service motels generally lack an on-site restaurant, meeting/conference space, room service, and pools or spas. The Monarch is the only full-service hotel in the Clackamas area. In return for eschewing the amenities of a full-service hotel, patrons at limited-service hotels expect, and receive, lower room rates. The trend in the hotel industry is away from full-service hotels and toward limited-service hotels. That development has coincided with an expansion of franchised restaurants that often locate near limited-service hotels and serve the food needs of hotel patrons. Although full-service hotels may garner a higher average daily rate (ADR) for their rooms, they also incur significantly higher expenses due, in part, to the costs associated with food service.

As the parties prepared for trial, a severe problem with the Monarch's exterior stucco siding (EIFS) was discovered. That problem first appeared to manifest itself in 1995 as a window-leakage problem. At that time, all windows were replaced to ameliorate the leaking. However, the windows were not the root of the problem, so the replacement did not provide the hoped for solution. Over the intervening years,

the leakage continued causing significant water damage and ongoing maintenance and repairs. It was not until shortly before trial that taxpayers pinpointed the problem as arising from the EIFS siding system. The parties stipulated at trial that a buyer on January 1, 2000, would have discovered the damage, that the cost to repair is $2,175,000, and that a deduction of $2,175,000 should be made from any general calculation of RMV.

## III. ISSUE

The issue before the court is the RMV of the Monarch as of January 1, 2000.

## IV. ANALYSIS

■ In Oregon, real property is taxed on the lesser of the property's maximum assessed value (MAV) or the property's RMV. ORS 308.146(2).[3] ORS 308.205(1) defines RMV, in relevant part, as:

"[T]he amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

■ There are three traditional methods used to find the value of real property. The cost approach, the income capitalization approach, and the market approach. For good reasons, neither taxpayers' nor the county's appraiser used the cost approach; therefore, the court's analysis will focus on the income and sales approaches.

### A. *Appraisals*

The RMV for the Monarch found by the Magistrate Division was $8,800,000.[4] The assessed value (AV) on the roll is $7,991,337. The appraisers in this case have rendered opinions of value for the Monarch that diverge considerably. Taxpayers' appraiser valued the Monarch at $6,120,000 while the county's appraiser valued it at $10,470,000. Those

---

[3] All references to the Oregon Revised Statutes (ORS) are to 1999.

[4] *Allen v. Clackamas County Assessor*, No 010569D (Jan 17, 2002). This conclusion was reached before the EIFS problem was identified.

values reflect deductions of $530,000 each for personal property[5] but no reduction for the EIFS problem.

A current threaded through the case is the trending of the hotel industry away from full-service establishments, such as the Monarch, toward limited-service establishments, such as the Courtyard Marriott. Evidence of that trend is supported by the relatively small number of full-service hotel sales available for comparables and the construction of several limited-service hotels near the Monarch. Taxpayers' appraiser sees that trend as hitting the Monarch's value harder than does the county's appraiser.

■    Both appraisers relied on the income approach. The county's appraiser also conducted a sales comparison approach and a room rent multiplier (RRM). Taxpayers' appraiser characterized his effective gross income multiplier (EGIM) method as a sales approach. However, because EGIMs are mathematically related to direct capitalization, the court determines that method is more properly considered as a subset of the income approach and will discuss it therein.

B.  *Income Approach*

■    The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces. *See Union Pacific Railroad v. Dept. of Rev.*, 315 Or 11, 20, 843 P2d 864 (1992). That boils down to present value being equal to what an investor believes the property could earn for her in the future.

■    The direct capitalization method used by both appraisers focuses on two key components: (1) the capitalization rate (cap rate) and (2) net operating income (NOI). In turn, those two numbers must be calculated appropriately to reach a proper value. The appraisers used different cap rates, different NOIs, and therefore reached different values.

---

[5] Both parties agree that $530,000 of personal property is properly deducted from the RMV of the Monarch.

### 1. *Net Operating Income*

■   To employ the income approach, an NOI for the subject property for a single year must be calculated. NOI is the currently expected net income of a property after all operating expenses are deducted from gross income. Appraisal Institute, *The Appraisal of Real Estate* 484 (12th ed 2001). To calculate the NOI, appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data. In the direct capitalization methodology, unlike a discounted cash flow or yield methodology, future NOI is not projected or estimated. Several components of the NOI are particularly important in reaching a proper NOI. Those are summarized in the following table.

Table 1. *NOI Variables*

| Variables | Plaintiff Valuation | County Valuation |
|---|---|---|
| Average Daily Rate (ADR) | $62.00 | $65.29 |
| Occupancy rate | 74% | 77% |
| Estimated Income | $6,060,017.00 | $6,525,852.00 |
| Department expenses | $3,896,000.00 | $3,225,355.00 |
| Undistributed expenses | $1,094,801.00 | $1,671,435.00 |
| Fixed expenses | $236,800.00[6] | $449,026.00[7] |
| Total Expenses | $5,227,601.00 | $5,345,816.00 |
| Net Operating Income | $832,415.00 | $1,180,036.00 |
| Income/expense ratio | 86.3% | 82% |
| Capitalization Rate | $12.50[8] | 9.5 |
| Indicated Value | $6,700,000.00 | $11,000,000.00 |

[6] The county's fixed expenses include $122,722 for property taxes. Taxpayers' appraiser did not include property taxes as an expense and instead added the millage rate of .0148 to their cap rate.

[7] The county calculated fixed expenses to include management fees. In order to compare the numbers more easily, that item was instead counted among the undistributed expenses as taxpayers' appraiser has done. That does not reflect that either taxpayers' or the county's method of accounting for management fees was preferable, it is simply a convenience.

[8] Taxpayers' appraiser calculated an 11 percent cap rate that results in a 12.5 percent cap rate after the rounded millage rate of 1.5 percent is added.

### a.  Average Daily Rate (ADR)

■  The calculation of the ADR gives an overall estimate of income from rooms. Taxpayers used an ADR of $62.00. The county used an ADR of $65.29. Plaintiffs' exhibit 2 indicates that the actual Monarch ADR was $66.86 in 1996, $66.29 in 1997, $66.96 in 1998, and $66.29 in 1999.[9] The *Trends* ADR for suburban Portland was $77.08 in 1996, $75.58 in 1997, $76.15 in 1998, and $79.71 in 1999. Although 287 new rooms came online in the Monarch's immediate area in 1999, the court is not persuaded that the ADR would drop as drastically—nearly $5.00—as taxpayers' appraiser estimated. Although rooms were being added in the neighborhood, much of the Monarch's business appears to be less sensitive to ADR alone and requires a full-service hotel. The county estimated a $1.00 per-day drop from 1999 levels. The county's appraiser attempted to support that conclusion by arguing that in the future, rates would stabilize in that area. That approach improperly projects future income in a direct capitalization methodology.

Taking into consideration the overall trends in ADRs for suburban Portland hotels, the subject's history, and the increased supply of rooms, the court estimates the appropriate adjustment is a $2.79 per-day reduction, resulting in an ADR of $63.50.

### b.  Occupancy

Taxpayers used an occupancy rate of 74 percent. The county used an occupancy rate of 77 percent.[10] The actual Monarch occupancy rate was 84.4 percent in 1996, 76.8 percent in 1997, 78.8 percent in 1998, and 76.8 percent in 1999. The *Trends* occupancy rates for suburban Portland were 75.2 percent in 1996, 72.3 percent in 1997, 71.4 percent in 1998, and 67.6 percent in 1999.

---

[9] In Plaintiffs' Exhibit 1, taxpayers' appraiser quotes ADRs of $67.12 for 1998, $66.30 for 1999, and $61.81 for 2000. Trial testimony established that Plaintiffs' Exhibit 2 was created in-house at the Monarch. The ADRs taxpayers' appraiser used appear to arise from an unattributed table in the Addendum of Plaintiffs' Exhibit 1. The court will utilize the numbers from the verified source.

[10] The county's appraiser testified that the occupancy rate of 62 percent in his appraisal was a typographical error. The other calculations in the appraisal support the use of a 77 percent occupancy rate.

The court believes the county's appraiser was too optimistic in his estimate of occupancy for the Monarch. Taxpayers' estimated rate of 74 percent is more convincing, given the increase in the supply of hotel rooms and the downward trending of occupancy rates in suburban Portland generally and for the Monarch specifically.

Calculating the income from 193 rooms based on an ADR of $63.50 and an occupancy rate of 74 percent, yields a gross income from rooms of $3,310,210. Taxpayers' estimates for other departmental income, $2,282,000, will be used because they are based on a 74 percent occupancy rate. Total gross income of $6,138,210 is therefore indicated.

c. Expenses

The county estimated an 82 percent stabilized expense rate. Taxpayers estimated a stabilized expense rate of 86.3 percent. In calculating that expense rate, taxpayers compared the Monarch's actual expenses with the data contained in *The Host Study* by Smith Travel Research (STR), identified as experts in the industry. Taxpayers adjusted several of their expenses to bring the ranges closer to those found in STR. However, their 86.3 percent ratio is still far higher than STR's 69.8 percent expense ratio for full-service hotels with highway orientation. Taxpayers' comparable properties, used both to calculate the cap rate and in the EGIM approach, all had lower expense ratios as noted in the table below.

Table 2. *Taxpayers Comparable Improved Sales*[11]

| Property | Sale Date & Price | # of Rooms | Expense Ratio | EGIM | Cap Rate | Year Built | Full or Ltd |
|---|---|---|---|---|---|---|---|
| 1. Best Inns Albany | 2/99 $4,185,000 | 78 | 63.50 | 3.22 | 10.99 | 1995 | Ltd |
| 2. Best Inns Beaverton | 2/98 $2,100,000 | 51 | 52.00 | 3.75 | 12.80 | 1985 | Ltd |
| 3. Best Inns Portland | 12/00 $2,800,000 | 75 | 53.40 | 3.41 | 13.75 | 1973 | Ltd |

---

[11] Summary compiled from Plaintiffs' Exhibit 1.

| Property | Sale Date & Price | # of Rooms | Expense Ratio | EGIM | Cap Rate | Year Built | Full or Ltd |
|---|---|---|---|---|---|---|---|
| 4. Satellite Motel Beaverton | 4/99 $2,116,889 | 48 | 59.44 | 4.00 | 10.50 | 1970s | Ltd |
| 5. Holiday Inn Express-Stark Portland | 7/00 $3,300,000 | 84 | 73.00 | 2.04 | 13.20 | 1986 | Ltd |
| 6. Crown Plaza Lake Oswego | 1/98 $21,505,000 | 161 | 56.00 | 3.99 | 11.00 | 1989 | Full |
| 7. Guest House Vancouver, WA | 3/01 $1,600,000 | 47 | 49.30 | 4.20 | 12.07 | 1984 | Ltd |
| 8. Ramada Ltd. Tualatin | 7/00 $2,000,000 | 68 | 61.80 | 2.83 | 13.50 | 1970s | Ltd |

As the table indicates, the expense ratios range from 49.3 percent to 73 percent, with the only full-service hotel, the Crown Plaza, having an expense ratio of 56 percent.

Taxpayers state their higher expenses are due to the dated nature of the property, banquet service inefficiencies, moderate room rates, and higher repair and maintenance costs. The county states the higher expense ratios are due to the fact that taxpayers deducted reserves for replacement from their NOI while the comparables did not and, perhaps, the fact that the Monarch is a full-service hotel while seven-of-eight comparables are limited-service hotels that generally have lower expense ratios.

### (1) Reserves for Replacement

■      Taxpayers use a 3 percent reserve for replacement in their expense calculation for the subject. Inclusion of reserves for replacement is proper only if the comparables used to develop a cap rate did so as well.

This excerpt from *The Appraisal of Real Estate* elucidates the importance of calculating the NOI for the subject and cap rate comparables in the same fashion.

"Deriving capitalization rates from comparable sales is the preferred technique when sufficient data on sales of similar, competitive properties is available. Data on each property's sale price, income, expenses, financing terms, and market conditions at the time of sale is needed. In addition, **the appraiser must make certain that the net operating income of each comparable property is calculated and estimated in the same way that the net operating income of the subject property is estimated** * * *. Both the income and expense data (on the date of valuation plus the next 12 months) and the structure of expenses in terms of replacement allowances and other components should be similar to those of the subject. * * *."

Appraisal Institute at 531 (emphasis added).

The county's appraiser John Taylor testified that he confirmed with the owners of each of taxpayers' comparables that reserves for replacement were not included in their NOI calculations. Although taxpayers highlighted a number of typographical errors in Taylor's appraisal, there was no question of his credibility on that point and the court accepts his testimony as true. Taxpayers argue that even if not removed in a line item, reserves for replacement are often wrapped into repairs and maintenance so there is no error. That argument is appealing. However, because taxpayers deducted reserves for replacement in addition to having exceptionally high repairs and maintenance expenses, that error is not counterbalanced. The court determines that the appropriate method to fix that inconsistency is to add the reserves for replacement back into the subject's income stream.

The county's appraiser calculated reserves for replacement of 4 percent for the subject property and for his comparable properties. For the purposes of this case, and for the reasons discussed below in connection with determination of the cap rate, the court determines the proper method is **not** to subtract reserves for replacement.

Accordingly, after addition of reserves for replacement back into the gross income of the subject property, the resulting NOI is $969,687 (with property taxes included).

### (2) EIFS Problem

Another reason for disallowing any deduction from NOI for reserves is connected to the ongoing siding problem that first arose in 1995.

Taxpayers' Operations Manager Kathy McKinney testified that in approximately 1995 a leakage problem was discovered and all windows were replaced, putting 18 rooms out of circulation at a time. In 2001 taxpayers discovered that the window replacement had not solved the water leakage and that significant repairs to the EIFS would need to be made as that was the real source of the problem. The parties have stipulated that the cost to repair is $2,175,000 and that a buyer would have discovered that problem as of the assessment date.

Taxpayers' appraiser states "[t]he subject's high payroll costs are partially due to the dated nature of the property **with higher maintenance costs**." Taxpayers estimate repairs and maintenance expenses for the Monarch at 4 percent. Taxpayers indicate that the *STR* cost for repairs and maintenance is 2.4 percent. Although it is unclear just how much the ongoing EIFS problem contributed to higher than typical repair and maintenance costs, common sense dictates that a problem that ultimately requires $2.2 million to remedy would have generated significantly higher expenses somewhere, most likely in repairs and maintenance. McKinney's testimony that the ongoing costs would not have been large is not convincing to the court.

Taxpayers' use of higher expenses results in a lower NOI, which in turn results in a lower overall value. To then take $2,175,000 off the top of that number appears to the court to be double counting of the EIFS problem.

### (3) Property Taxes

The appraisers diverged considerably on the proper treatment of the property tax expense. Taxpayers left property taxes out of the expenses and chose to account for them by adding the millage rate to the cap rate.[12] The county used

---

[12] That is an accepted method of dealing with property taxes in a value appeal where the amount of the taxes is a function of the ultimate value that has yet to be

the maximum potential tax burden of $122,722 as an expense. The court accepts the county's method for purposes of this case.[13]

It is useful to note that taxpayers' estimated expense ratio for the Monarch is 86.3 percent without property taxes and the county's is 82 percent with property taxes. Taxpayers' and the county's total estimated expenses are relatively close: $5,227,601 and $5,345,816, respectively. Adding the county's estimated property taxes of $122,722 to taxpayers' total estimated expenses, the numbers become closer still: $5,350,323 and $5,345,816. With estimated numbers this large, a difference of $4,507 is tantamount to reaching the same number.[14]

Utilizing estimated gross income of $6,138,210 and estimated total expenses of $5,168,523 yields an NOI of $969,687 with property taxes deducted.

## 2. *Capitalization rate*

■  A cap rate is generally calculated using market sales. Slight deviations in cap rates profoundly change the estimated value of a property, making the proper calculation of the rate of paramount importance.

Taxpayers state that "*[T]he Korpacz Real Estate Investor Survey* for the 3rd Quarter 1999 indicates an overall capitalization rate of 8 to 13 percent with an average of 10.15 percent for full-service hotels." Taxpayers calculated a cap

---

determined. Appraisal Institute, *The Appraisal of Real Estate* at 513. In a system such as Oregon's, however, that method does not best approximate the proper tax burden because of the impact of Article XI, section 11(Measure 50). The MAV places a cap on property taxes, which means that the nominal tax rate may not be the actual tax rate. In such situations, an iterative approach may be needed in the computations.

[13] For the purposes of this appeal, the maximum tax burden will be used. Currently, the Monarch's AV is equal to the MAV ($7,991,337). The county has conceded to the maximum tax burden of $122,722 based on the MAV. This appeal could result in an RMV low enough to replace the Monarch's MAV as the new AV. Use of the maximum tax burden is therefore adverse to the county and beneficial to taxpayers, as it could only potentially overstate expenses, thereby understating overall value. The county has, in effect, waived any benefit available to it under an iterative approach.

[14] The court notes that although there was much discussion at trial of management fees and allocation of employee expenses, the county's ultimate judgment about appropriate expenses indicates that there is no real issue here.

rate of approximately 11 percent, to which they added the rounded millage rate of 1.5 percent. The county calculated a cap rate of 9.5 percent.

Taxpayers based their rate on eight market sales with cap rates ranging from 10.5 to 13.75[15] percent, located from Albany, Oregon, to Vancouver, Washington.[16] Only one of the eight, the Crown Plaza in Lake Oswego, was a full-service hotel.

Taxpayers' appraiser Donald Palmer testified that he calculated the cap rates for the comparables based on NOI as reported by either the buyer, seller, or broker. In some cases, the sales prices were found in deed records if not available from the buyer, seller, or broker. There was no evidence in the record indicating how the NOI for each property was calculated and Palmer testified, "we have to rely on the information they share with us."[17]

Taxpayers' market sales used to extract a cap rate are not as comparable as could be hoped. Taxpayers' appraiser Palmer testified in response to whether those were good comparables that "this was the group of sales we had."

As Table 2 demonstrates, most of those properties were 50 to 75 percent smaller than the Monarch, were limited service, and lacked freeway exposure. The Crown Plaza, with an 11 percent cap rate, is probably most comparable to the subject.

---

[15] The county's appraiser testified that the sale of comparable 3 (reflecting a 13.75 cap rate) never closed.

[16] The properties and their addresses are as follows:
1. Best Inns, 1100 Price Rd, SE, Albany
2. Best Inns and Suites, 3333 SW 198th Ave, Beaverton
3. Best Inn & Suites, 3828 NE 82nd Ave, Portland
4. Satellite Motel, 13295 SW Canyon Rd, Beaverton
5. Holiday Inn Express, 9707 Stark St, Portland
6. Crown Plaza, 14811 Kruse Oaks Blvd, Lake Oswego
7. Guest House, 11504 NE Second St, Vancouver, Washington
8. Ramada Limited, 17993 SW Lower Boones Ferry Rd, Tualatin

[17] That quotation reflects a reality recognized by the county's appraiser as well: income information sources are limited and may have little incentive to provide needed information.

■ As discussed in the expenses section above, taxpayers calculate a 3 percent reserve for replacement. That is an accepted practice. However, it is imperative that any comparable properties also calculate a reserve for replacement in arriving at their NOI or otherwise appropriate adjustments must be made. Palmer testified that he did not verify whether his comparables used to calculate a cap rate included reserves for replacement as an expense. Taylor testified that he did verify that reserves for replacement were **not** included in the expenses in reaching the NOI of each of taxpayers' appraiser's cap rate comparables. The court understands the difficulty of extracting private, financial data from wary business owners. At the same time, it is error for taxpayers' appraiser to develop a cap rate based on comparables that do not subtract reserves for replacement when reaching NOI and then to apply that cap rate to an NOI for the subject that has 3 percent reserves subtracted.[18]

■ The county's appraiser used three sales to derive his cap rate. The Holiday Inn-Wilsonville, the Hawthorne Inn in Gresham, and the Holiday Inn Express-Troutdale. Those had rounded cap rates, respectively, of 9.4, 9.8, and 9.9. Taxpayers question the county's appraiser's treatment of subtracted reserves for replacement from the Holiday Inn-Wilsonville, subtraction for excess land for the Hawthorne Inn, and the mismatch of a 1999 NOI and 2001 sales price being used to calculate the cap rate of the Holiday Inn Express-Troutdale. It is well established in appraisal theory that the fewer adjustments made to market sales, the better, in terms of ensuring the properties are true comparables. The court notes taxpayers' criticisms and takes them into consideration.

The county's appraiser chose to subtract reserves for replacement of 4 percent for the subject property under his final value calculation. In order to match the cap rate comparables' NOI with the subject's NOI, he subtracted 4 percent reserves from each of his comparables. Although that method avoids the pitfall of taxpayers' approach, the court believes

---

[18] Taxpayers' appraisal is nearly bereft of details explaining how the cap rates were calculated for the comparables, as well as how the ultimate 11 percent cap rate was chosen for the subject.

that method artificially deflates the cap rate, which in turn, improperly skews the value upward. In addition, testimony at trial by both Palmer and Holiday Inn-Wilsonville owner Pat Lockhart indicated that the usual practice is not to remove reserves for replacement. Lockhart testified, "it is a financial concept, not an operating concept." The county's materials contained sufficient detail for the court to recalculate cap rates for each of the three comparables adding reserves back in. That resulted in cap rates ranging from 11 to 12.5 percent rounded. Those numbers are bolstered by Lockhart's testimony at trial that cap rates for full-service hotels at that time were in the 12 to 14 percent range. As an active participant in the market at that time (Lockhart purchased the Holiday Inn-Wilsonville during September 2000), the court gives Lockhart's testimony significant weight.

Bearing all evidence provided by both appraisers in mind, the court concludes a cap rate of 12 percent for the Monarch is proper. The NOI of $969,687 capitalized at a rate of 12 percent yields a value of $8,080,729 under the income approach.

### 3. *Income Multiplier Methods*

Both appraisers in this case applied an income multiplier method to reach an opinion of value for the subject. For income producing properties such as the subject, effective gross income may be used to calculate an opinion of value by applying a relevant gross income multiplier or gross rent multiplier. Appraisal Institute, *The Appraisal of Real Estate* at 546.

The county's appraiser chose to calculate a gross rent multiplier that he identifies as a room rent multiplier (RRM). Taxpayers' appraiser chose to use an effective gross income multiplier (EGIM).[19]

### a. Room Rent Multiplier (RRM)

The county's appraiser calculated a RRM to estimate the value of the subject using sales comparables 1, 2, 3,[20] and

---

[19] Taxpayers' appraisal discusses the EGIM method under a sales comparison approach, however, this method is more properly considered within the income approach.

[20] The county's sales comparables are laid out in Table 3.

the Holiday Inn Express-Troutdale. Those yielded RRMs of 2.52, 2.51, 3.62, and 3.78, respectively. From those RRMs, a RRM for the subject of 3, resulting in a rounded value of $10,700,000, was determined. Due to substantial differences in the properties used to calculate the RRM such as limited versus full service and disparate expense ratios, the court declines to place any weight on that method.

### b. Effective Gross Income Multiplier (EGIM)

Taxpayers' appraiser did not conduct a price-per-unit analysis. Palmer testified that he chose not to conduct a per-unit sales comparison because the comparables were not adequate, "we don't have any sales that really have any significant full services." He chose instead to calculate a value using the EGIM as a unit of comparison. The EGIMs for the comparables are presented in Table 2.

*The Appraisal of Real Estate* explains that method as follows:

> "Gross income multipliers (GIMs) are used to compare the income-producing characteristics of properties. Potential or effective gross income may be converted into an opinion of value by applying the relevant gross income multiplier. This method of capitalization is mathematically related to direct capitalization because rates are the reciprocals of multipliers or factors."

Appraisal Institute at 546. As a method related to direct capitalization, it bears the same cautions in relation to the importance of comparability of properties.

As the data in Table 2 indicate, the expense ratios of the comparables used by taxpayers diverge substantially from the Monarch's. EGIMs for those comparables range from 2.04 to 4.2, with an average of 3.44. From those, taxpayers' appraiser estimates an EGIM for the subject of 1.08, resulting in a value of $6,515,000.

That method suffers from the same lack of comparability as the county's RRM method. Palmer himself admitted that the sales lacked comparability. The court is at a loss to understand, and Palmer does not attempt to explain, how sales that lack sufficient comparability for a per-unit comparison can generate a useful value under the EGIM method,

which, like the RRM, is particularly sensitive to a lack of comparability. The court reaches a different conclusion on this issue, determining that properties that are weak comparables can provide more useful data in a sales comparison or cap rate determination than they could for either RRM or EGIM methods that focus on limited variables of each comparable. A traditional sales comparison looks more holistically at the property, therefore dissimilarities can be better accounted for, resulting in a more valid estimate of value. Consequently, the court places no weight on that method of valuation.

### 4. *Sales Approach*

The county's appraiser used seven comparable properties in the sales approach to value as noted in Table 3 below. In his view, each of the comparables have strengths and weaknesses in terms of comparability to the subject. The following summarizes the county's appraiser's data on the comparables: Comparable 1, the Holiday Inn-Wilsonville, is similar in size, age, level of service, condition, and ADR; however, it is dissimilar because of inferior quality of location and occupancy rate. Its sale price per room of $32,544 reflects the low end of value. Comparable 2, the Holiday Inn-Portland, is similar in age, location, and ADR; however, it is dissimilar due to smaller size, limited level of service, and superior condition. Its sale price per room of $45,595 reflects the midrange of value. Comparable 3, the Hawthorne Inn, is dissimilar in terms of smaller size, inferior location, superior age, and lower ADR. Its sale price per room of $48,317 reflects the midrange of value. Comparable 4, the Alderwood Inn, is similar in size, level of service, and quality of location; however, it is dissimilar due to superior age and condition. Its sale price per room of $47,467 reflects the midrange of value. Comparable 5, the Best Western, is dissimilar due to inferior size, age, location, level of service, and condition. Testimony of taxpayer Samuel Allen and other evidence indicated that this sale to the Portland Development Commission may not have been an arm's-length transaction. Its sale price per room of $54,124 reflects the mid-to-upper range of value. Comparable 6, the Imperial, is similar in size, level of service, and condition; however, it is dissimilar due to inferior age and superior downtown Portland location. Its sale price per

room of $81,256 reflects the upper range of value. Comparable 7, the Residence Inn, is similar in size, age, condition, and ADR; however, it is dissimilar due to enhanced services and much larger rooms. Its sale price per room of $85,575 reflects the upper range of value.

Based on those comparables, the county's appraiser reached a per-room value for the subject of $55,000, resulting in a total value of $10,615,000. Taxpayers advocate a per-room value for the subject of $34,000, resulting in a total value of $6,562,000.

Weighing all the testimony and evidence presented and subject to reconciliation with other indicators, the court determines that a per-room value for the subject of $45,000 is proper, resulting in an indicated value for the subject of $8,685,000.

Table 3. *The County's Sales*

| | Property | Sale Date & Price | # of Rooms Price per Room | RRM | Cap Rate | Year Built | Full or Ltd |
|---|---|---|---|---|---|---|---|
| 1 | Holiday Inn-Wilsonville | 9/00 $5,500,000 | 169 $32,544 | 2.52 | 9.4 | 1977 | Full |
| 2 | Holiday Inn-Stark Portland | 7/00 $3,830,000 | 84 $45,595 | 2.51 | 12.0 | 1986 | Ltd |
| 3 | Hawthorne Inn- Gresham | 5/00 $3,382,200 | 70 $48,317 | 3.62 | 9.8 | 1993 | Ltd |
| 4 | Alderwood | 7/99 $7,120,000 | 150 $47,467 | - | - | 1998 | Full |
| 5 | Best Western | 6/02 $5,250,000 | 97 $54,124 | - | - | 1974 | Ltd |
| 6 | Imperial | 1/02 $10,400,790 | 128 $81,256 | - | - | 1908 | Full |
| 7 | Residence Inn-Lake Oswego | 1/98 $9,584,425 | 112 $85,575 | - | - | 1984 | Ltd |

## IV.   CONCLUSION

The county's appraiser conducted a sales approach estimation of RMV. Utilizing the data provided by the county's appraiser, the court determined a RMV of $8,685,000 indicated by that method. Taxpayers' appraiser declined to conduct a sales approach estimation of value because he concluded the available sales lacked sufficient

comparability to yield a valid result.[21] The court agrees with taxpayers' appraiser that the available sales provide a weak indicator of value for the subject; therefore, the court believes only minimal weight may be placed on that method.

After carefully evaluating all the evidence and testimony presented by both parties, it is the conclusion of the court that the RMV for the subject property for the tax year 2000-2001 was $8,200,000. In accordance with the stipulation of the parties, that value is reduced by $2,175,000 for the EIFS damage and $530,000 for personal property resulting in a final value of $5,495,000. The county shall correct the assessment and tax rolls to reflect the above stated RMV of taxpayers' property as defined in ORS 308.162(2), with any refund due to be promptly paid with statutory interest pursuant to ORS 311.806 and ORS 311.812.

---

[21] Although taxpayers' appraiser did conduct an EGIM estimate under the heading "Sales Comparison Approach," the court considers that method, a derivative of the direct capitalization method, an income approach.