IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

PALATINE INVESTMENTS LLC,       )
                                )
            Plaintiff,          )   TC-MD 110622N
                                )
      v.                        )
                                )
MULTNOMAH COUNTY ASSESSOR,      )
                                )
            Defendant.          )   **DECISION**

Plaintiff appeals the real market value of property identified as Account R338182

(subject property) for the 2010-11 tax year. Trial was held in this matter on December 7, 2011,

in the Tax Courtroom, Salem, Oregon. W. Scott Phinney, Attorney at Law, appeared on behalf

of Plaintiff. Amethyst Amico Weave (Amico), "community manager" for the subject property,

and Rick Bean (Bean), real estate broker, testified on behalf of Plaintiff. Lindsay Kandra,

Assistant County Counsel, appeared on behalf of Defendant. Larry Steele (Steele), Commercial

Property Appraiser, and James Sanders (Sanders), Appraiser 2, testified on behalf of Defendant.

Plaintiff's Exhibit 1 and Rebuttal Exhibits 2, 3, and 5 were offered and received without

objection. Plaintiff offered Rebuttal Exhibit 4 and Defendant objected on the basis that it does

not rebut any of Defendant's evidence and should have been provided within the time allowed

for the exchange of exhibits under Tax Court Rule-Magistrate Division 10. The court admitted

pages 2-3 of Plaintiff's Rebuttal Exhibit 4 for the purpose of providing a complete list of

"upgrades" to Defendant's comparable sale 5.[1] The court excluded page 1 of Plaintiff's Rebuttal

Exhibit 4 because it does not rebut Defendant's evidence.[2] Defendant's Exhibit A was offered

---

[1] The list of "upgrades" to Defendant's comparable sale 5 is not the complete list identified in the property listing. (*See* Def's Ex A at 24; Ptf's Rebuttal Ex 4 at 2.)

[2] Page 1 of Plaintiff's Rebuttal Exhibit 4 is Bean's calculation of a capitalization rate for Defendant's

and received without objection.  Defendant offered Exhibit B as a rebuttal exhibit to Bean's testimony concerning the market "crash" in late 2008.  (*See* Ptf's Ex 1 at 12.)  Plaintiff objected to Defendant's Exhibit B as irrelevant (pages 3-16 of the exhibit concern residential markets) and also because Sanders is not an expert in statistics.  Defendant responded that the Exhibit B was offered to demonstrate that the multi-family (apartment) market was affected differently than markets for other residential and commercial property.  The court admitted Defendant's Exhibit B, for the limited purpose offered; Plaintiff's objection goes to the weight of the evidence.

## I.  STATEMENT OF FACTS

The subject property is the Applegate Apartments located on SE Division Street near 182nd in Portland, Oregon.  (Ptf's Ex 1 at 1, 8.)  Amico testified that the subject property was built in 1978 and is an "older" property.  She testified that the subject property includes 12 buildings with 78 units.  (*See* Ptf's Ex 1 at 4.)  Plaintiff reported the subject property unit mix as including the following: 32 one bedroom, one bathroom units; 8 two bedroom, one bathroom units (with two different unit sizes); 34 two bedroom, 1 1/2 bathroom units (two units are larger than the other 32 units); 1 two bedroom, two bathroom unit; 2 three bedroom, 1 1/2 bath townhouse units; and 1 three bedroom, two bathroom unit.  (*Id.*)  Amico testified that the "1/2 bath" refers to an additional sink.  She testified that many of the subject property units have original counters and cabinets.  Amico testified that units have washer and dryer hookups, but the subject property does not include onsite laundry.  She testified that the subject property has a playground, but does not have a pool, fitness room, or covered parking.  Amico testified that all of the subject property units have patios or decks and 10 units have fireplaces.

---

comparable 5.  However, Bean provided a calculation of the capitalization rate, albeit a different number, for that property in Plaintiff's Exhibit 1 at 57.  Plaintiff did not purport to offer Rebuttal Exhibit 4 at 1 for the accuracy of the information contained therein.  The court could discern no purpose for the Plaintiff's Rebuttal Exhibit 4 at 1 and excluded it from evidence.

Amico testified that the subject property is located in the "Centennial" neighborhood; it is close to the "Rockwood" neighborhood, which she described as the "murder capital of Oregon." Amico testified that the subject property neighborhood suffers from high crime rates and, as a result, it is necessary to provide a night security guard at the subject property. She testified that several cars have been stolen from the subject property and that there had been several break-ins of other cars within the few months before trial. Bean provided Portland maps "CrimeMapper" maps for the subject property showing crimes in the 12 months preceding "10/31/2011" that occurred within one-half mile radius of the subject property. (Ptf's Ex 1 at 8-11.) Bean conceded on cross examination that the crime data provided does not pertain to January 1, 2010, and that he did not analyze crime statistics for his comparable sales.

Bean testified that the subject property has higher than typical density for garden style apartments. He testified that the subject property's amenities are typical to worse than other apartments in the area, most of which have carports. Bean testified that the subject property suffers from "obvious" wear on the counters; the appliances and counters will have to be replaced within the next few years.

Amico testified that the subject property is managed by Princeton Property Management[3] and that she has been the community manager for the subject property for one year,[4] but has eight years of experience managing apartment properties. Amico testified that she markets the subject property and seeks out new tenants. She testified that she keeps a wait list for potential tenants waiting for specific units to become available. Amico testified that she reviewed the

---

[3] Bean testified that Princeton Property Management is one of the major property management companies in the Portland area and has approximately 100 assets under management.

[4] Amico also testified concerning the subject property condition and Defendant objected to that testimony, because Amico was not the community manager at the subject property as of January 1, 2010, and had no knowledge of the subject property condition as of January 1, 2010.

subject property budget comparisons, but that she does not make budget decisions for the subject property. (*See* Ptf's Ex 1 at 16-25.) She testified that the cost associated with unit turnover is in the range of $2,400 to $3,500 depending on the condition of the unit when the tenant left.

Amico testified that, as compensation, she receives a salary, but not free rent. On cross examination, Defendant questioned why the subject property budget includes as an expense "employee units." (*See* Ptf's Ex 1 at 25.) Amico testified that she does not know why that was included as an expense; she pays full rent for her unit. Bean testified subsequently that the manager's rent is taken out of her pay. He further testified that it does not make any difference in the analysis of the subject property value if payment to the property manager is a salary or free rent for an employee unit. The subject property expenses include a line for "salary-managers" which was $31,584.21 in 2009. (*Id.* at 22.)

The parties agreed that the cost approach had no relevance to the subject property value as of January 1, 2010. Bean testified that he completed a "broker opinion of value" in which he determined the value of the subject property using the income approach and a "market data analysis" of 11 comparable sales. (Ptf's Ex 1 at 12-14.) Steele testified that he inspected the subject property and completed an appraisal. He testified that he or someone from Defendant's office also inspected each property that he used as a comparable sale or rent comparable.

A.    *Income approach*

Bean utilized the subject property actual rents in his income analysis, stating "market potential rent" of $587,100 in 2007; $604,358 in 2008; $636,000 in 2009, and $636,000 in 2010. (Ptf's Ex 1 at 15.) He testified that Princeton Property Management provided him with rent comparables prepared in April 2010, that support the subject property actual rents. (Ptf's Ex 1 at 34.) He testified that he did not confirm the data regarding rent comparables provided, but rather

relied on the professionalism of Princeton Property Management to provide accurate information. Bean also used Plaintiff's actual figures for loss to lease, vacancy loss, concessions, and other income.[5] As a percentage of "market potential rent," the subject property "vacancy loss" was 4.07 percent in 2007; 3.50 percent in 2008; 4.11 percent in 2009; and 7.63 percent in 2010. (*Id.* at 15.) Bean testified that he thinks that the subject property actual vacancy is at the market vacancy rate. Bean calculated effective gross income for the subject property of $558,005 in 2007, $607,707 in 2008, $600,059 in 2009, and $576,676 in 2010. (*Id.*)

Bean also relied on the subject property's actual expenses, excluding property taxes, which were $304,588 in 2007; $340,529 in 2008; $335,252 in 2009, and $328,194 in 2010. (Ptf's Ex 1 at 15.) As a percentage of effective gross income, Bean's expenses for the subject property not including property taxes were 45.17 percent in 2007, 46.80 percent in 2008, 46.26 percent in 2009, and 46.55 percent in 2010. (*Id.*) Bean testified that the subject property budget includes no provision for replacement reserves, so he used replacement reserves of $250 per unit, for a total of $19,500. (*Id.*) Bean testified on cross examination that he considered market expense data and the subject property expenses seemed to be within the range of market rates. He subtracted "employee unit" as an additional expense in each year 2007 through 2010. (*Id.*) Bean calculated net operating income (NOI) of $274,511 in 2007; $287,641 in 2008; $287,670 in 2009, and $272,097 in 2010.[6] (*Id.*) He testified that the subject property has very stable NOI and appears to be "stabilized."

Bean testified that, to determine an appropriate capitalization rate, he considered both actual sales from East Portland/Gresham and market surveys from Marcus and Millichap, Norris

---

[5] Bean testified that, beginning in 2008, tenants at the subject property had to pay utility charges in addition to rent. The income from "utility charges" is reflected as "other income" in Bean's analysis. (*See* Ptf's Ex 1 at 15.)

[6] Not including the expense for "employee unit," the subject property NOI is $286,481 in 2007; $303,823 in 2008; $302,964 in 2009, and $288,746 in 2010. (Ptf's Ex 1 at 15.)

and Stevens, Realty Rates, Real Capital Analytics, the Barry Apartment Report, and Metro Multifamily Housing. (*See* Ptf's Ex 1 at 36 (noting in bold font the reports that Bean considered most applicable to the subject property).) He testified that the properties most relevant to the subject property are "class C," older, "garden style" apartments. The capitalization rates of the 11 actual sales that Bean identified as comparable ranged from 6.80 to 11.80 percent with an average of 8.56 percent; the sales occurred between November 2008 and June 2010. (*Id.* at 57, 59.) Capitalization rates from the market surveys that Bean identified as most relevant range from 6.2 to 11.8 percent. (*Id.* at 36.) Bean selected a capitalization rate of 8.50 percent, to which he added a property tax rate of 0.95 percent[7] for an overall rate of 9.45 percent and a 2010-11 real market value of $3,000,000, rounded. (*Id.* at 15.)

Bean testified that the market "crash" occurred in late 2008; after that time, market vacancy increased and both asking and effective rents decreased. Bean provided market surveys and articles supporting that testimony. (*See* Ptf's Ex 1 at 37, 42-44, 48, 89-94.) Sanders testified that he prepared Defendant's Exhibit B as a rebuttal to Plaintiff's evidence about the "crash." (*See* Def's Ex B at 1 (graph of "average price per unit" for "pre-1990 built apartment" sales reported by Norris & Stevens).) He testified that the average price per unit rose from 2005 to 2008, dropped, and then began to rise again in 2010. Sanders testified that the point is that the market for apartments behaved differently than the residential market; as people lost their homes, they moved into apartments.

Steele identified eight rent comparables and determined a range of rents per square foot for four different unit types.[8] (Def's Ex A at 28-32.) Using the "median market rent" per square

---

[7] Bean testified that he calculated the property tax rate of 0.95 percent using the changed property ratios for multi-family properties in Multnomah County for the 2010-11 tax year. (*See* Ptf's Ex 1 at 56.)

[8] Steele's four unit types were one bedroom, one bathroom; two bedroom, one bathroom; two bedroom, one

foot for each unit type, Steele determined "indicated market rent per unit" for each unit type in the subject property. (*Id.* at 33.) Steele concluded that "[t]he market rents indicated * * * by competing apartment properties in the [subject property's market area indicate that the [subject property's] asking rents are somewhat above the current market rates. This is to be expected due to the superior maintenance and management of the subject [property]." (*Id.*) Steele relied on his rent comparables and determined potential gross rental income of $612,372. (*Id.* at 37.) He relied on the subject property actual income for "other income" and concluded other income of 3.5 percent of potential gross income. (*Id.* at 33-34.) Steele considered several market surveys from the fourth quarter 2009 and the first quarter 2010 that reported vacancy ranging from 4.0 to 6.9 percent; he selected a vacancy rate of 5.0 percent. (*Id.* at 34.) He testified on cross examination that, according to Plaintiff's "rent roll," seven of the subject property units were vacant as of January 1, 2010, which is nine percent vacancy. (Ptf's Ex 1 at 33.) Steele calculated effective gross income of $603,187. (Def's Ex A at 37.)

> Steele testified that, for expenses, he considered the "Mark Barry" report indicating
>
> "that the average expense rate for Older Garden Style Apartments (1964-1989) showed a range of 41%-50% of Effective Gross Income. This percentage included property taxes which must be backed out of those figures, as that expense is factored into the 'loaded' cap rate. For the study conducted by Mark Barry it was reported that Real Estate Taxes comprise about 8.2% of EGI." [9]

(Def's Ex A at 35.) He considered other surveys including "Integra Realty Resources Market Pulse Report for Q1 2010" indicating expenses ranging from 36.5 to 50 percent, or 27 to 42 percent after property taxes are removed. (*Id.*) Steele concluded an expense ratio of 40 percent,

/ / /

---

and one-half bathroom; and three bedroom, one and one-half bathroom. (Def's Ex A at 32.)

[9] Steele testified that the actual property taxes for the subject property were 9.03 percent of gross income.

excluding property taxes and including 2.5 percent for reserves for replacement. (*Id.*) He determined NOI of $361,912. (*Id.* at 37.)

Plaintiff noted that the Barry report relied on by Steele is based on 2007 and 2008 apartment sales and questioned why Steele relied on that report. (*See id.* at 59.) Steele testified in response that he used the best available information and that the Integra report confirms the expense ratios stated in the Barry report. Plaintiff noted and Steele agreed that the "Integra" report only includes class A and class B apartment properties. (*See id.* at 53-54.) Steele testified that he agrees with Bean that the subject property is a class C property.

Steele testified that he considered actual sales as well as market surveys to determine a capitalization rate for the subject property. (*See* Def's Ex A at 36.) He reported capitalization rates for his comparable sales ranging from 6.45 to 7.31 percent and market surveys from 2009 and 2010 with capitalization rates ranging from 6.00 to 7.78 percent. (*Id.*) Steele selected a capitalization rate of 6.5 percent, to which he added a property tax rate of 1.15 percent, for an overall rate of 7.65 percent. (*Id.* at 37.) He testified that a lower capitalization rate is justified for the subject property because it is well-maintained. Steele determined a value of $4,730,000 under the income approach. (*Id.*) He testified that he also completed a "reconstructed income approach" using Plaintiff's operating statements and Defendant's reserves for replacement and capitalization rate. (*See id.* at 38-39.) Steele determined a value of $4,650,000 under the "reconstructed income approach." (*Id.* at 39.)

B.      *"Market data analysis"*

Bean completed a "market data analysis" based on sales of comparable properties. He described his methodology as follows:

> "To compare the sales to the subject [property] the [NOIs] were compared. Since this is the key factor to an investor it makes sense to use it as a basis of

analysis.  Also the NOI captures all factors that influence items of income and expense.  The comparison was made on both a per unit and per square foot basis.  A ratio of subject NOI to comparable NOI is determined.  That ratio is then applied to the comparable sale price per unit or square foot to obtain an indication of value for the subject.  This is in effect equalizing the subject and the comparables on the basis of their earning power.  The goal is the same whether the adjustments are made on a specific item basis or are based on an overall unit of comparison."

(Ptf's Ex 1 at 14.)  Bean testified that NOI reflects differences including location, amenities, rent concessions, and any other differences with the exception of market conditions at the time of sale; NOI serves as a better "equalizer" than adjustments because it is objective.  Bean testified that he accounted for potential differences in market conditions by selecting sales from same time and market conditions as January 1, 2010.  As support of his approach, Bean provided a July 1990, article from The Appraisal Journal, *An Analysis of Indicators of Multi-Family Complex Values*.  (*Id.* at 81-88.)

Bean testified on cross examination that he is not an appraiser or an expert in statistics and that he cannot explain how the approach described in the Appraisal Journal article works.  Defendant noted, and Bean agreed, that the Appraisal Journal article is based on data collected in Atlanta in the mid-1980's.  Bean testified that articles published in the Appraisal Journal have been "vetted" and have some "credence."  Bean conceded, however, that he cannot testify as to whether the Appraisal Journal article is something that is taught to or accepted by appraisers.

Bean identified 11 apartment sales for his "market data analysis," ranging from 12 to 50 units and from 7,707 to 38,000 square feet.  (Ptf's Ex 1 at 57, 58.)  Defendant questioned why Bean's comparable sales are all smaller than the subject property with respect to the number of units and the size.  Bean testified that, as between a 20-unit property and 120-unit property, he would compare the subject property to the 20-unit property because larger properties are

/ / /

purchased by a different type of investor. He testified that smaller units tend to have a higher value per unit. Bean testified that he verified each sale "to the extent possible."

Defendant cross-examined Bean at length regarding each of his comparable sales. Bean testified that he could not recall how he calculated NOI for the sale of "240-244 NE 143rd Avenue." (Ptf's Ex 1 at 57, 58.) He testified that he did not provide any data concerning the properties located at "1217 NE 122nd Avenue," "16000 SE Alder Street," or "12702 E. Burnside St." (*Id.*) Bean testified that the capitalization rate of "10900-11006 NE Broadway Street" was 9.09 percent, not 8.09 percent. (*Cf. id.* at 57, 61.) Bean testified on re-direct that the sales he relied on in his market data analysis were all confirmed and the capitalization rates were reported, not calculated. He testified that the source of his capitalization rates and sale prices were CoStar and Norris and Stevens.

Bean testified that he analyzed each sale based on NOI per unit and NOI per square foot and determined an indicated value per unit and an indicated value per square foot. (Ptf's Ex 1 at 57, 58.) [10] For the subject property Bean used an NOI per unit of $3,121 and an NOI per square foot of $3.84.[11] (*Id.* at 57.) The subject property is 63,325 square feet. (*Id.* at 58.) The NOI per unit of Bean's comparable sales ranged from $3,604 for "16000 SE Alder Street," a 50-unit property, to $5,787 for "240-244 NE 143rd Avenue," a 13-unit property. (*Id.* at 57.) The NOI per square foot of Bean's comparable sales ranged from $4.15 per square foot for "1217 NE 122nd Avenue," a 33,998 square foot property, to $7.49 per square foot for "10746 NE Wygant Street," a 7,707 square foot property. (*Id.* at 58.) Bean's average indicated value per unit is $37,195.92 and his average indicated value per square foot is $45.82. (*Id.* at 57, 58.) Defendant

---

[10] Plaintiff's Exhibit 1-57 contains a typo and should read "Applegate" instead of "Arborview."

[11] Bean testified that the NOI per unit that he used in his "market data analysis" is less than the NOI that he determined under his income approach because the actual NOI reported by Plaintiff includes property taxes as an expense and does not include replacement reserves. (*See* Ptf's Ex 1 at 15, 57, 58.)

questioned Bean on cross examination as to why he used averages rather than medians. Bean testified that the mean is a good way to reconcile data and that the median indicated value per unit is only about $400 more than the average. (*See id.* at 57.)

Bean testified that both indicated values under his "market data analysis" suggest a real market value of $2.9 million for the subject property. He testified that he gave the most weight to the income approach and determined a reconciled real market value of $2,975,000 for the subject property.

C.     *Sales comparison approach*

Steele testified that he considered factors including the sale date, year of construction, condition, quality, unit mix, and location, and identified five comparable sales for the subject property. (*See* Def's Ex A at 16, 18-25.) Steele's comparable sales ranged in size from 43 to 90 units except for sale 1, Meadowland Apartments, with 168 units. (*Id.*) Steele testified that he selected the property with 168 units because he wanted to bracket the subject property. Steele's comparable sales occurred between September 2008 and June 2011, with unadjusted prices per unit ranging from $48,889 to $65,774, and unadjusted prices per square foot ranging from $52.14 to $73.96 per square foot. (*Id.* at 16.) He testified that he made "qualitative adjustments" (superior, inferior, or comparable) for a variety of categories, finding sales 2 and 5 to be overall "comparable" to the subject property. (*Id.* at 26.)

Plaintiff questioned Steele about the relevance of "unit mix" to value. Steele testified that more types of units are superior. He testified on cross examination that his sale 2 should be listed as "inferior" to the subject property with respect to "unit mix" because it has only two types of units. (*Cf.* Def's Ex A at 26.) Steele testified on cross examination that sale 1, Meadowland Apartments, was a "1031 exchange" but, according to Lauren Noecker, the buyer's

representative, that had "no effect on the buyer." (*See id.* at 48.) Steele testified that, according to Spencer Noecker, the buyer's representative, sale 4 was also a "trade." (*See id.* at 50.) Plaintiff noted that sale 4 was never on the market. (*See id.* (stating that sale 4 was on the market for "1 day").) Plaintiff provided a rebuttal exhibit demonstrating that the different numbers reported by the buyer of Defendant's sale 4 result in different NOI and capitalization rates of 7.21 percent and 9.44 percent as compared with the rate of 6.45 percent reported by Steele. (Ptf's Rebuttal Ex 3; Def's Ex A at 22.) Steele testified in response that he considers buyer-reported capitalization rates more reliable than calculated rates.

Steele's sale 2 sold for $73.44 per square foot or $48,889 per unit and sale 5 sold for $73.96 per square foot and $53,000 per unit. (Def's Ex A at 26.) He determined sale 5 to be the "best comparable" and determined prices of $74 per square foot and $53,000 per unit for the subject property, or $4,680,000 (square feet) and $4,130,000 (units). (*Id.* at 27.) Steele's sale 5, "16000 SE Alder St," was also utilized by Bean in his "market data analysis." (Ptf's Ex 1 at 57; Def's Ex A at 17.) Steele reported that sale 5 "had some recent upgrades, like a new roof, exterior paint, and a resurfaced parking lot, making it very similar to the subject [property] in condition." (Def's Ex A at 24.) Plaintiff provided a rebuttal exhibit listing all of the renovations to Steele's sale 5: "new roofs, new vinyl windows, new staircases * * * [and] a newly resurfaced parking lot." (Ptf's Rebuttal Ex 4 at 2.) Steele concluded a value of $4,600,000 under the sales comparison approach. (Def's Ex A at 27.) In his reconciliation, Steele placed the most weight on the income approach and concluded a 2010-11 real market value of $4,700,000 for the subject property. (*Id.* at 40-41.)

The 2010-11 roll real market value of the subject property is $4,647,350. (Ptf's Compl at 2.) The 2010-11 maximum assessed value of the subject property is $3,329,240. (*Id.*) Plaintiff

requests a 2010-11 real market value of $2,975,000. (Ptf's Ex 1 at 1.) Defendant requests that

the 2010-11 roll real market value be sustained.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2010-11

tax year. "Real market value is the standard used throughout the ad valorem statutes except for

special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No

020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345

(1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash
> that could reasonably be expected to be paid by an informed buyer to an informed
> seller, each acting without compulsion in an arm's length transaction occurring as
> of the assessment date for the tax year." [12]

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in

accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). There

are three methods of valuation that must be considered, although all three may not be applicable

in every case: (1) the cost approach, (2) the sales comparison approach, and (3) the income

approach. OAR 150-308.205-(A)(2)(a); *see also Allen v. Dept of Rev.* (*Allen*), 17 OTR 248, 252

(2003). Plaintiff has the burden of proof and must establish its case by a preponderance of the

evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of

evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

"[T]he court has jurisdiction to determine the real market value or correct valuation on the basis

/ / /

---

[12] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are
to 2009.

of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

The parties agree that the income approach should be given the most weight. Defendant also determined values under the sales comparison and "reconstructed income" approaches and gave some weight to those approaches. Plaintiff provided a "market data analysis," relying on comparable sales, and gave that approach secondary weight to the income approach. The court finds that the income approach should be given the most weight in this analysis.

A.    *Income approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen*, 17 OTR at 253 (citations omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income[.]" *Id.* at 253. "NOI is the currently expected net income of a property after all operating expenses are deducted from gross income. To calculate the NOI, appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Allen*, 17 OTR at 254 (citing Appraisal Institute, *The Appraisal of Real Estate* 484 (12th ed 2001)).

"[T]he income approach should be based on enough historical data so that a normalized expected income can be determined with confidence. Most experts believe that three to five years, preferably longer, of income experience are needed to make such an estimate." *Confehr v. Multnomah County Assessor* (*Confehr*), TC-MD No 110621D at 14 (Feb 27, 2012) (citing *Bauman et al v. Dept. of Rev.*, 6 OTR 426, 433 (1976) (citations omitted)); *see also Valley River Ctr. v. Dept. of Rev.*, 6 OTR 386, 372 (1976). Plaintiff provided income and expense data for the subject property from 2007, 2008, 2009, and 2010. Both Bean and Steele agreed that the subject

property asking rents are at or slightly above market rents. Bean relied on the subject property actual rents, other income, loss to lease, vacancy loss, and concessions. He concluded effective gross income of $600,059 for 2009 and $576,676 for 2010. (Ptf's Ex 1 at 15.) Steele relied on rent comparables, the subject property actual "other income," and a five percent vacancy rate for effective gross income of $603,187. (Def's Ex A at 37.) The court accepts as reasonable the subject property actual income and finds that the effective gross income was $600,000 as of January 1, 2010.

The parties disagree with respect to operating expenses. Bean relied on the subject property actual expenses which, as a percentage of effective gross income and excluding property taxes, ranged from 45.17 to 46.80 percent between 2007 and 2010. He also included replacement reserves of $250 per unit, or $19,500. Steele determined expenses of 40 percent, including reserves, based on two market surveys. The subject property is well-managed and Plaintiff's actual expenses appear to be reasonable, albeit at the high end of the range of expense ratios reported by Steele's market surveys. Steele's expense ratio conclusion is based on older data from 2007 and 2008, as well as expenses for class A and class B properties, suggesting that the subject property expenses would be higher than those reported by Steele's market surveys. The court finds that the subject property expenses were 46 percent as of January 1, 2010, and accepts Bean's 2.5 percent for reserves for replacement. Bean also included an "employee unit" as a separate expense. However, the subject property "budget comparison" included "salary-managers" as an expense ($31,584.21 in 2009) and Amico testified that she does not receive a free unit as part of her compensation. The court finds that Bean's expense for an "employee unit" appears to be double-counting and is not supported in this case. Thus, the court finds that the subject property NOI was $304,500.

"A cap[italization] rate is generally calculated using market sales. Slight deviations in cap[italization] rates profoundly change the estimated value of a property, making the proper calculation of the rate of paramount importance." *Allen*, 17 OTR at 260. The parties also disagree with respect to an appropriate capitalization rate for the subject property as of January 1, 2010. Bean considered both actual sales in East Portland/Gresham (rates reportedly ranged from 6.80 to 11.80 percent) and market surveys (rates reportedly ranged from 6.2 to 8.68 percent) and he concluded a capitalization rate of 8.50 percent for the subject property, to which he added a property tax rate of 0.95 percent for an overall rate of 9.45 percent. Steele determined a capitalization rate of 6.50 percent based on actual comparable sales with rates ranging from 6.45 to 7.31 percent and market surveys reporting capitalization rates ranging from 6.00 to 7.78 percent. He added a property tax rate of 1.15 percent for an overall rate of 7.65 percent. Both Bean and Steele agree that the subject property is an older, class C property, suggesting a higher capitalization rate than class A and B properties. However, Steele testified that the subject property is well-maintained. The court finds that a reasonable capitalization rate for the subject property as of January 1, 2010, was 7.75 percent. Including the property tax rate of 1.15 percent reported by Defendant, the court finds that the overall rate applicable to the subject property was 8.9 percent for an indicated value of $3,420,000, rounded, under the income approach.

B.    *Sales comparison approach*

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions * * *."

OAR 150-308.205-(A)(2)(c). "The court looks for arm's-length sale transactions of property similar in size, quality, age and location * * * in order to determine the [real market value]" of the subject property. *Richardson*, WL 21263620 at *3 (2003).

Bean completed a "market data analysis" in which he used NOI as a substitute for adjustments and developed an indicated value per unit and indicated value per square foot for each comparable sale identified. In support of his methodology, Bean provided an article from the July 1990 issue of *The Appraisal Journal*. Gary L. Bernes, MAI, & Phillip S. Mitchell, MAI, *An Analysis of Indicators of Multi-Family Complex Values*, APPRAISAL JOURNAL, July 1990, at 379. In a recent decision, this court discussed the reliability of Bean's "market data analysis" and concluded that "Plaintiff offered no statute or administrative rule that authorizes or states that a market data analysis is equivalent to or a substitute for a sales comparable approach." *Confehr*, TC-MD No 110621D at 13. Furthermore, Bean testified that he is not an appraiser and cannot, therefore, testify that his "market data analysis" methodology is an accepted appraisal technique.

Steele determined values of $53,000 per unit and $74 per square foot under the sales comparison approach, for values of $4,130,000 (based on units) $4,680,000 (based on square feet). (Def's Ex A at 27.) Steele gave more weight to the price per square foot and concluded a value of $4,600,000 for the subject property under the sales comparison approach. It is not clear to the court why Steele gave more weight to price per square foot rather than price per unit. The court notes that Steele's comparable sale 1, which he determined to be overall "superior" to the subject property, sold for $66.77 per square foot, suggesting that a value of $4,227,075 is a high indicator of value for the subject property. The court finds that the value of the subject property under the sales comparison approach as of January 1, 2010, was $51,000 per unit, or $3,978,000.

### III. CONCLUSION

After careful consideration of the testimony and evidence presented, the court finds that the real market value of the subject property as of January 1, 2010, was $3,500,000. For the court to order a change in real market value, Plaintiff must be aggrieved. ORS 305.275(1)(a). To be

aggrieved, the ordered change to the tax roll must result in a property tax reduction. The 2010-11 maximum assessed value of the subject property is $3,329,240, and the court did not receive evidence as to whether a reduction in the real market value to $3,500,000 would result in tax savings to Plaintiff. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2010-11 real market value of property identified as Account R338182 was $3,500,000. The tax roll will be adjusted only if Plaintiff is aggrieved.

Dated this ___ day of April 2012.


_____
ALLISON R. BOOMER
MAGISTRATE PRO TEMPORE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Pro Tempore Allison R. Boomer on April 4, 2012. The Court filed and entered this document on April 4, 2012.*