IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

XEROX CORPORATION,                          )
                                            )
            Plaintiff,                      )     TC-MD 101341B
                                            )
      v.                                    )
                                            )
CLACKAMAS COUNTY ASSESSOR,                  )
and DEPARTMENT OF REVENUE,                  )
State of Oregon,                            )
                                            )
            Defendants.                     )     **DECISION**

Plaintiff appeals the real market value (RMV) of property identified as Accounts

00805613, 00805061, and 01469459[1] (subject property) for the 2010-11 tax year.  A trial was

held in the Tax Courtroom on September 26 through 28, 2011, and on October 3 through 5,

October 20, 21, 26, and 28, 2011.  David L. Canary and Cynthia M. Fraser, Attorneys at Law,

appeared on behalf of Plaintiff.  Witnesses for Plaintiff were Richard Schmachtenberg

(Schmachtenberg), Senior Vice President of Consumer Development for Plaintiff; Sandra

Lessert (Lessert), Western District Regional Product Manager for Plaintiff; David Hill (Hill),

Commercial Real Estate Broker and Senior Vice President, Grubb & Ellis; and Brian A.

Glanville (Glanville), CRE, FRICS, MAI, Certified General Real Estate Appraiser, Integra

Realty Resources (Integra).  Joseph A. Laronge, Assistant Attorney General, appeared on behalf

of Defendants.  Witnesses for Defendants were Mark Gharst (Gharst), Appraiser Analyst 4,

Property Tax Division Appeals Team, Department of Revenue; Ronald Saunders (Saunders),

Registered Appraiser, Clackamas County Assessor's Office; and Candence E. Robinson

(Robinson), Registered Appraiser, Appeals Team, Department of Revenue.

---

[1] Two of the three accounts at issue include land only.  Account 00805613 includes both improvements and land.

The following Exhibits offered by Plaintiff were admitted: 1-7, 8 (pp 1-4), 9 (pp 1-2), 10, 11, 12, 15-21, 23-32, 33 (for the limited purpose of establishing that size is relevant to sale price), 34-36, 37 (protected as confidential), and 38-40. The following Exhibits offered by Defendants were admitted: A, B (pp 500000-01, 500081-269, 500364-366, 500369-372, 500377-432, 500591-539, 500548-681, 501023-1047, 501051-1258, and 501267-68, M-Q, R (as rebuttal), S-Y, Z (pp 1-2), AA-CC, DD (pp 1-4, 8-20), and EE-BBB. The parties filed written closing arguments on December 29, 2011. Given voluminous exhibits and extensive trial testimony, the Statement of Facts is limited to a description of the subject property, Plaintiff's use of the subject property, and market conditions pertinent to the January 1, 2010, assessment date. The parties' appraisal reports and value evidence are discussed in the Analysis section.

I. STATEMENT OF FACTS

The 2010-11 tax roll real market value (RMV) of the subject property is $94,494,697, with $66,772,750 allocated to the improvements and $27,721,947 allocated to land. Plaintiff requests a 2010-11 RMV of $46 million. Defendant requests that the 2010-11 RMV be sustained.

A.    *Subject Property Improvements*

The subject property is a 136.7 acres[2] industrial campus located in Wilsonville, Oregon, with improvements totaling 831,031 square feet (SF) over four buildings: 60/61, 63, and 83. (*See* Ptf's Ex 1 at 7, 43, 59.) The subject property improvements were built in the late 1970s and early 1980s by Tektronix. (Ptf's Ex 1 at 57.) Schmachtenberg testified that, at that time, Tektronix was "vertically integrated"; communication was more challenging so it was important that all were located in close proximity of one another. Tektronix sold the subject property to

---

[2] The "gross land area" according to county records is 137.29 acres. (Ptf's Ex 1 at 7, 43.) Glanville determined a gross site area of 136.67 acres based on a November 2006 Land Title Survey. (*Id.* at 43.)

Plaintiff "in September 1999 as part of the sale of Tektronix's Color Printing and Imaging Division as a going-concern * * * for $950 million. The acquisition * * * brought to [Plaintiff] all 2,400 Tektronix color printing and imaging employees worldwide." (Ptf's Ex 1 at 8.) The value allocated to the real property and buildings in the 2000 sale was $29,600,000. (*Id.*)

Lessert testified that the subject property was developed with an "inward focus" and public access is limited for security reasons. She testified that the subject property includes very limited "closed" office space; most offices are cubicles. Glanville testified that the subject property includes a much higher percentage of "circulation," 156,088 SF or 37.6 percent of all office space, than is typical in the office market. (Ptf's Ex 1 at 70-71.) He testified that 6,919 SF, or 1.7 percent of the subject property office space, is "enclosed office." (*Id.* at 71, 107.)

Lessert, Hill, Glanville, and Gharst all agreed that the subject property office space is "general purpose" "flex" space. Hill testified, and Gharst agreed, that the subject property office space is "class A flex." (*See* Ptf's Ex 4 at 8.) Hill testified that "class A flex" is "good industrial office" characterized by big floor plates and single story construction; it is not "professional" office space. Robinson described the subject property as "a Class A," citing the Building Owners and Managers Association International definition of "Class A" as: "Most prestigious buildings competing for premier office users with rents above average for the area. Buildings have high quality standard finishes, state of the art systems, exceptional accessibility and a definite market presence." (Defs' Ex A at 201030.) When questioned, Robinson testified that her definition of "Class A" is "Class A flex," as described by Hill. Glanville and Lessert testified that the subject property does not include "Class A" office. (Ptf's Ex 34 at 9.)

/ / /

Glanville testified that building 60/61 is wood frame construction with brick veneer, which is inferior to the steel frame construction of buildings 63 and 83, noting that building 83 is above average quality for manufacturing. Building 60/61 is 385,355 SF gross, with 381,501 SF net rentable; building 63 is 239,954 SF gross, with 237,918 SF net rentable; and building 83 is 205,722 SF gross, with 203,247 SF net rentable. (Ptf's Ex 1 at 59.) Lessert testified that building 60 includes a large "cube farm" for sales channel, service, finance, and engineering employees, as well as engineering and lab space. (Ptf's Ex 3 at 7.) She testified that building 63 includes manufacturing space for solid ink and print head components, lab space, and two clean rooms; one clean room is 11,000 SF (7,000 SF of "clean space") and the other is 4,000 SF. (*Id.* at 2.) She testified that the clean rooms are "class 1000," not as good as others in the industry. Lessert testified that building 83, used primarily for distribution and configuration of products, features four different ceiling heights for various levels of storage and as well as cubicles. (*Id.* at 5; Ex 1 at 83, 69.) As of January 1, 2010,[3] the vacant cubicle space totaled 35,390 SF. (Ptf's Ex 3.)

Lessert testified that a sale and leaseback of the subject property has been considered three times, most recently in 2009. Glanville testified that he did not research and consider the potential sale and leaseback because he considered it irrelevant to the January 1, 2010, valuation date and because it would not involve a sale of the fee simple interest in the subject property. Robinson testified that she was unable to determine "the offering price" at the time that Plaintiff considered a sale and leaseback offer. (Defs' Ex A at 201017; Defs' Ex B at 501254.)

/ / /

/ / /

---

[3] Lessert provided maps of the subject property buildings reflecting occupancy and use as of April 20, 2010. (Ptf's Ex 3.) She testified that occupancy and use was the same as of January 1, 2010.

Even though several witnesses testified regarding the feasibility of converting the subject property from single-tenant to multi-tenant as well as the marketability of large campus properties, Glanville and Robinson both concluded that the highest and best use (HBU) of the subject property as improved is its continued use as a single-tenant industrial campus. (Ptf's Ex 1 at 89; Def's Ex A at 201026.)

B.    *Subject property land*

The subject property is zoned Planned Development Industrial (PDI). (Ptf's Ex 1 at 46.) Glanville testified that the PDI does not include a maximum density, but it includes parking requirements that were satisfied by the subject property. (*Id.*) The subject property land is encumbered by a Bonneville Power Administration (BPA) easement, a "buffer zone," and a "Significant Resource Overlay Zone" (SROZ). Glanville determined, and Saunders agreed, that the "unencumbered developable site area" is 74.3 acres and the "potentially developable site area" (including 11.4 acres subject to the BPA easement) is 85.7 acres.[4] (*Id.* at 53; Defs' Ex X.)

The BPA easement along the northern border of the subject site allows "[n]on-structural uses which are compatible with electric transmission lines * * * such as parking, open storage, loading, and landscaping." (Ptf's Ex 1 at 49.) The "buffer zone," along the southern border of the site, was created by an agreement between Tektronix and Mentor Graphics. (*Id.* at 50.) That agreement "provides that neither party shall remove any tree from the Buffer Strip or construct any improvement in the Buffer Strip or substantially alter any existing improvement in the Buffer Strip * * * without the prior written approval of the other party." (*Id.*)

/ / /

---

[4] Glanville testified that there is no survey of the subject property SROZ land; his conclusion of 42.7 acres for the SROZ was based on city maps. The SROZ is "bordered by a 25-foot wide "impact area" that Glanville included as "usable area" because "some new development may be allowed." (Ptf's Ex 1 at 47, 48.)

The SROZ bisects the subject property. (Ptf's Ex 1 at 47.) "The purpose of the SROZ is to implement the goals and policies of the Comprehensive Plan relating to natural resources, open space, environment, flood hazard, and the Willamette River Greenway." (*Id.* at 46.) "New structures, development and construction activities shall not be permitted within the SROZ if they will negatively impact significant natural resources." (Defs' Ex GG at 10.) The SROZ allows "[m]aintenance and repair of buildings, structures, yard, gardens or other activities or uses that were in existence prior to the effective date of these regulations." (*Id.* at 11.) Glanville testified, and Saunders agreed, that the SROZ land is not walkable with the exception of a small area between buildings 60/61 and 63. Gharst testified that, when he visited the subject property, he observed employees picking berries on the SROZ land between buildings 60/61 and 63.

C.     *Market conditions*

Hill testified that, in the national real estate market, the "rumblings of recession" began in the latter part of 2007, but the Portland real estate market was still okay. He testified that, in 2008, many properties were on the market and it became clear that the market was slowing. Hill testified that 2007 and 2008 market conditions were atypical; real estate is a "cyclical" market but, in his 25 years experience, the market has never been as "high" as in 2007. (Ptf's Ex 7 at 2.) He testified that there were 59 sales of industrial properties in 2006 and 54 in 2007, but only 18 sales in 2009, a 66 percent decrease from 2007. (*Id.* at 1.) Hill testified that none of the Portland sales that occurred in 2009 exceeded $10 million, with the exception of one "portfolio sale" of $37 million. (*Id.* at 1.) Glanville testified that, as of 2010, the Portland market was "bouncing along the bottom"; it did not perceptibly change from January 1, 2010, to September 2010. He testified that Portland Metro industrial property sales dropped 27 percent from the peak in 2007

/ / /

to January 1, 2010; commercial property sales decreased 30 percent during that time. (Ptf's Ex 1 at 92.) Gharst noted that 2010 industrial sales volume was close to the 2004 level. (*Id.* at 37.)

Hill testified that Grubb & Ellis forecasted that the market would begin to improve in 2010. (Ptf's Ex 7 at 1.) At the end of 2009, Grubb & Ellis reported that the industrial market had "turned a corner," noting the vacancy rate had stabilized and net absorption was positive:

> "With few quality properties currently on the market and no sign of a substantial increase to come, supply and demand conditions should be favorable for sellers of quality real estate in 2010 and industrial real estate is at or near the top of most lists. * * * * * 2010 could be the best year for sellers of the next few years."

(*Id.*) Hill testified that the industrial market was slightly better in 2011 than in 2010. He testified, as of the fourth quarter 2009, the Portland office market was worse than the industrial market; sales fell to 18 in 2009, after 43 in 2007 and 30 in 2008. (*Id.* at 4.) Grubb & Ellis forecasted office market vacancy would begin to stabilize by the end of 2010. (Ptf's Ex 5 at 3.)

Robinson testified that the subject property is located in the "silicon forest," including Washington and Oregon, and that the Portland market "is indicative of the region overall." (Defs' Ex A at 201018, 201028; Defs' Ex LL.) She analyzed the markets for R&D "offices and labs"; "administrative offices"; and "manufacturing and distribution space." (Def's Ex A at 201028-29, 201096-201153.) She stated that, in the Portland office market:

> "[A]sking rents were rising slightly by 3Q2009, but concessions to gain new tenants were also higher than they had been in prior years. * * * Sales volume remained low. Higher quality assets benefitted in terms of sales, while lesser properties languished on the market. The overall office market was in a state of decline at the end of 2009."

(*Id.* at 201028; *see also* 201135.) Robinson conceded that asking rents for industrial property were falling from 2008 to 2010 and vacancy was increasing for all property types. (*Id.* at 201104.)

/ / /

Robinson reported that, "[i]n 2009 the high tech industry (a potential user of the subject facilities) saw the fastest sales growth ever experienced in the latter half of the year, in spite of an annual production fall of 11%." (Defs' Ex A at 201029; *see also* 201149.) She testified that "a national report from Grubb & Ellis indicated that Oregon, due to his high tech companies, would be one of the five states to lead the nation into a recovery." (Defs' Ex B at 500498.) When questioned about her "high tech" market data, based in large part on the semi-conductor industry, Robinson conceded that the subject property is not competitive with semi-conductor properties. (Defs' Ex A at 201138, 201148, 201153; s*ee also* Ptf's Ex 34 at 5.) Regarding "Manufacturing And Distribution Space," Robinson reported, "[i]n 2009 the industrial market ended the year depressed. * * * Rents were falling and forecast to fall further still. * * * In the metropolitan Portland area, net absorption was negative, but forecast to outpace new construction deliveries in 2010." (Defs' Ex A at 201029.)

## II. ANALYSIS

The issue before the court is the RMV of the subject property for the 2010-11 tax year. ORS 308.411(1)[5] states, in pertinent part, that the RMV of an industrial plant:

> "shall be determined for ad valorem tax purposes under ORS 308.205, 308.232 and 308.235 utilizing the market data approach (sales of comparable properties), the cost approach (reproduction or replacement cost of the plant) or the income approach (capitalization of income) or by two or more approaches."

RMV is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205. The assessment date for the 2010-11 tax

/ / /

---

[5] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2009.

year was January 1, 2010. ORS 308.0079(1)(a); ORS 308.210(1). Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.    *Highest and Best Use*

HBU is "the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." *The Appraisal of Real Estate* 278[6]; OAR 150-308.205-(A)(1)(e). Glanville and Robinson concluded, and the court agrees, that the HBU of the subject property as improved is its continued use "for a single owner-occupant." (Ptf's Ex 1 at 89; Defs' Ex A at 201026.)

B.    *Excess Land; surplus land*

> "Excess land is land that is not needed to serve or support the existing or proposed improvement. The [HBU] of the excess land may or may not be the same as the [HBU] of the improved parcel. Excess land has the potential to be sold separately and must be valued separately.
>
> "Surplus land is not currently needed to support the existing improvement and cannot be separated from the property and sold off. Surplus land does not have an independent [HBU] and may or may not contribute value to the improved parcel."

*The Appraisal of Real Estate* at 214. Glanville identified "two currently undeveloped areas lying outside of the SROZ which would appear to have some development potential" that he determined to be "surplus land," not "excess land." (Ptf's Ex 1 at 48, 90.) Robinson testified that she determined about 20 acres[7] of the subject property land to be excess land based on land

/ / /

---

[6] All references to *The Appraisal of Real Estate* are to the Appraisal Institute 13th ed 2008.

[7] Robinson's analysis revealed 15.75 acres of potential excess land. (Def's Ex A 201031.) She apparently rounded that figure to 20 acres. (*Id.*)

DECISION TC-MD 101341B                                                                                     9

to building ratios of her comparable sales.  (Defs' Ex A at 201031.)  She testified that her excess land calculation would not require removing any of the subject property roads, but might require relocation of parking.  Glanville criticized Robinson's analysis, stating:  "An experienced appraiser must realize that a land to building ratio sets the parameters for potential excess land, if the improvements to the site do not hinder its development.  Clearly, this is not the case here and the land would be surplus and included in the County's estimate of value."  (Ptf's Ex 34 at 9.)

The court is not persuaded that the subject property site includes excess land.  Robinson's analysis reveals that the subject property includes land that is not necessary to support the subject property improvements.  However, that analysis alone does not establish that such land has its own HBU and may be sold separately from the subject property.  Absent such evidence, the court concludes that the 15.75 acres identified by Robinson are surplus, not excess, land.

C.      *Land Value*

Glanville determined, and Saunders agreed, that the subject property land includes 85.7 acres of "potentially developable site area" (including 11.4 acres subject to the BPA easement) and the remainder is undevelopable.  (Ptf's Ex 1 at 53; Defs' Ex X.)  The court accepts that determination and will consider the values of the "developable" and the "undevelopable" land.

Glanville and Saunders relied on the sales comparison approach to determine the RMV of the subject developable land.  The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp and McKenzie River Motors v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at [*]3 (Apr 3, 2007) (citations omitted).  The "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property.

*Richardson v. Clackamas County Assessor,* TC-MD No 020869D, WL 21263620 *3 (Mar 26, 2003). OAR 150-308.205-(D)(3)(c) states:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length transactions. When non-typical market conditions of sale are involved in a transaction (duress, death, foreclosure, bankruptcy, liquidation, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the non-typical market condition."

1.       *Potentially developable land value*

Glanville testified that he sought to determine the value of the subject property land as though vacant and available on January 1, 2010. (Ptf's Ex 1 at 94.) "Since 2005 there have been just two sales of vacant industrial sites over 50-acres in size," the FedEx sale and the Evergreen Aluminum sale. (*Id.* at 97.) Glanville testified that he expanded his research to include smaller properties given limited sales data and selected six comparable land sales, all of which are zoned industrial and have the same HBU as the subject property. He made adjustments for market conditions, location, size, other physical characteristics, SROZ impacts, and BPA easement. (*Id.* at 104.) Glanville did not make a quantitative time adjustment, but noted that "[d]iscussions with local market participants indicate a decline in land values anywhere from 10% to 15% for well located sites on up to as much as 25% or more for outlying industrial areas." (*Id.* at 102.)

Saunders testified that he identified three comparable land sales for the unencumbered developable land, two of which (FedEx and Solar World) were also used by Glanville. (Ptf's Ex 1 at 99-100, Defs' Ex A at 200962.) Saunders' third land sale, Evergreen Aluminum, was rejected by Glanville as a comparable. (Ptf's Ex 1 at 97, Defs' Ex A at 200962.) The three land sales most comparable to the subject property with respect to size are FedEx, Solar World, and Evergreen Aluminum. The court gives no weight to the four smaller land sales: Westmark

Center, McLane Foodservice Distribution Site, Dawson Creek Park, and Birtcher Center at Townsend Way, ranging in size from 18.27 to 25.89 acres. (Ptf's Ex 1 at 99-100.)

In October 2008, FedEx purchased a 77.73-acre site in Gresham for $5.00 per SF "for a major distribution center." (Ptf's Ex 1 at 97, 99.) Glanville testified that the price was agreed upon by the parties 18 months prior in early 2007 and that the seller built roads and utilities for FedEx. (*Id.;* Ptf's Ex 27 at 5.) He testified that the FedEx "site is located in an enterprise zone and Fed Ex was able to get five year tax abatement for the building improvements." (Ptf's Ex 27 at 6.) Glanville testified that a representative of the seller reported that proximity to the airport was a "critical factor" in this sale. (Ptf's Ex 1 at 97.) He testified that, but for the date of sale price negotiations, the FedEx sale is comparable to the subject property. Saunders agreed that the FedEx sale occurred at a better time in the market, requiring a downward adjustment. (Defs' Ex A at 200963.) He determined that the FedEx site is inferior to the subject property with respect to "arterial exposure, [] access and street improvements provided by the seller * * *." (*Id.*)

Saunders testified that, according to a representative of the seller, the FedEx site was a "Superfund site in 1994. An extensive cleanup was completed in 2006 making the site suitable for industrial uses[,] * * * [and] the Consent Decree was finalized in 2008, long after the majority of the remediation was complete." (Defs' Ex DD at 1.) Saunders testified that representatives of both the buyer and seller thought the sale price would be higher if it were not a Superfund site. He testified that there is a stigma associated with contaminated properties, suggesting an upward adjustment is necessary. Glanville testified that a representative of the seller reported that it "felt the property was sold at market, but the price was set 18 months earlier." (Ptf's Ex 32 at 1.) He testified that legal counsel and the director of real estate for

FedEx reported that it "purchased the site at its market value without any stigma attached." (*Id.*) Saunders testified that, "all things being equal," the FedEx sale indicates an adjusted sale price of $5.00 per SF.

In August 2007, Solar World Properties Inc. purchased the "Solar World Expansion Site," a 47.26-acre parcel, for $5.00 per SF. (Ptf's Ex 1 at 100.) Glanville reported that the sale price was set in March 2007, when the buyer was given a 12 month option with its purchase of "the Komatsu facility." (*Id.*) Saunders testified that the site is inferior to the subject property with respect to access and exposure, but it is smaller than the subject property and sold at a better time in the market. (Defs' Ex A at 200963.) He concluded an indicated value of $5.00 per SF. (*Id.*) Glanville testified that he concluded a value of $3.50 to $3.75 per SF for the Solar World sale.

In January 29, 2009, the Port of Vancouver purchased the 110-acre former Evergreen Aluminum site on the Columbia River in Vancouver for $5.11 per SF, gross, or $5.62 per SF net; 100 acres are developable. (Ptf's Ex 1 at 97; Defs' Ex A at 200962.) Saunders testified that it is a Superfund site; it entered escrow in mid-2007 but did not close until January 2009. (Defs' Ex A at 200963.) It "has 700 feet of deep water frontage and is bounded on the east and portions of the north and south by land owned by the Port of Vancouver[.]" (Ptf's Ex 1 at 97.) According to the real estate manager for the Port of Vancouver, it "did not pay a premium for the property because of its proximity to our nearby property's value would have been increased. Had the Evergreen/Alcoa site been 'clean,' we would have paid more for the property, which we have estimated would have been between $5.00 and $6.00 per SF at the time of negotiation in 2006." (Defs' Ex EE at 5.) Saunders testified that he considered the location and the contamination to

/ / /

be inferior to the subject property, but noted that the market conditions were superior. He testified that he concluded a value range of between $5.11 and $5.62 per SF.

Glanville testified that Saunders' adjustment to the Evergreen Aluminum sale for "access" is "confusing," noting the "site is located approximately 3.70 miles from an interchange to I-5, compared to the subject's 1.17 miles." (Ptf's Ex 27 at 6.) He further noted that the site:

> "has access to barge traffic on the Columbia River. * * * It has a dock attached to the site * * *. Water depth * * * is 42 to 48 feet which would allow for the mooring and loading of ocean going ships. * * * It is also zoned heavy industrial, which would not be allowed on the subject site. Finally, the site was purchased by the Port of Vancouver which adjoins this site and wraps around a significant portion. Most appraisers would make an adjustment for buyer motivation."

(*Id.*) Glanville and Saunders disputed the relative magnitude of adjustments for size, access, exposure, and market conditions. "Generally, as size increases, unit prices decrease." *The Appraisal of Real Estate* at 212; *see also Appraising Industrial Properties* at 94.[8] Glanville testified that there are fewer potential buyers for larger sites, thereby reducing prices. CoStar land listings were provided as support. (Ptf's Ex 1 at 96.) The average list price was $3.68 per SF for properties 50 to 99 acres and $3.50 per SF for a property over 100 acres. (*Id.*) Saunders testified that the property over 100 acres in size has been listed since March 2008, and the seller's representative reported that it is a rock quarry with differences in elevation of up to 80 feet that will likely require extensive terracing when developed. (Defs' Ex Y.) Saunders provided four land listings from 2006 to July 2009, ranging from 73.78 acres to 200.00 acres "maximum," with prices ranging from $5.00 to $7.00 per SF. (Defs' Exs Z at 1, AA at 2, BB, CC.)

Glanville disagreed that adjustments for exposure and access offset adjustments for size and market conditions, stating that he does "not believe that freeway exposure for an industrial

---

[8] All references to *Appraising Industrial Properties* are to the Appraisal Institute (2005).

site is equal to an adjustment for a site that is roughly half the size of the subject and for the drop in value caused by the real estate bubble." (Ptf's Ex 27 at 5.) He testified that exposure is not very important for industrial properties. Saunders testified that his market adjustments were relatively small, noting that a market participant reported "asking prices of * * * prime large parcels * * * in the Portland Metro area ha[ve] been holding steady for several years." He testified that owners of large parcels "are generally well-financed and do not need to sell."

Glanville determined a value range of $3.50 to $4.00 per SF and concluded $3.60 per SF, or $13,400,000, rounded, for the potentially developable site area. (Ptf's Ex 1 at 105.) Saunders testified that the Solar World sale is probably a low indicator of value, but gave the most weight to that sale and concluded $5.00 per SF for the subject property unencumbered developable land, or $16,182,540. (Defs' Exs A at 200963; Ex X.) The court is persuaded that Evergreen Aluminum is not a good comparable given its "deep water frontage" and its position adjoining the buyer's existing property. The price of $5.00 price per SF for the FedEx and Solar World sales reflects the superior market conditions of 2007. The proximity of the FedEx site to the airport and the benefit of enterprise zone exemption also suggest downward adjustments. The court is not persuaded that those adjustments are offset by remediated contamination or superior access and exposure. The court finds that a value range of $3.50 to $4.00 per SF range is persuasive and concludes a value of $3.60 per SF, or $13,400,000 (rounded) for the 85.7 acres of potentially developable land as of January 1, 2010.

2.  *Undevelopable land value*

Glanville testified, and Hill agreed, that the undevelopable land does not contribute to the value of the subject property. Both Saunders and Glanville agree that the undevelopable land is

not necessary for the landscaping requirements under the PDI.[9] (Ptf's Ex 27 at 7; Def's Ex A at 200953.) Saunders suggested that the SROZ land might have value for storm water discharge, but Glanville presented persuasive evidence that such use is unnecessary and impermissible. (Ptf's Ex 1 at 163, 165, 184; Ex 27 at 7; Ex 28; Ex 29, Defs' Ex GG at 11; Ex HH.) Saunders testified that developers would not consider the SROZ land valuable, but it might have open space value. He identified "two sales of open space property which were purchased by Metro during 2008 and 2009[,]" from which he concluded $0.62 per SF, or $1,377,367, for the subject property SROZ land. (Defs' Exs A at 200964, X.) Glanville testified that Metro "would not consider buying the subject SROZ land * * * because it is not located within an approved target area" and it is "already a protected area through zoning." (Ptf's Ex 30 at 1.) Glanville criticized Saunders' value based on the "public interest value concept" of "open space." (Ptf's Ex 27 at 8.) Glanville stated that open space "is a non-economic use driven by social, political and public policy goals and does not meet the definition of market value." (Ptf's Ex 27 at 8, citing *The Appraisal of Real Estate* at 31-32.)

> "If the property is subject to governmental restriction as to use on the assessment date under applicable law or regulation, [RMV] shall not be based upon sales that reflect for the property a value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions."

ORS 308.205(2)(d). "The comparability of competitive sites is based on their [HBU] on the date of sale. Regardless of how physically similar the potential comparable site is to the subject site, the sale property is not truly comparable if it does not have a similar [HBU] as the subject and should be dismissed from further consideration * * *." *The Appraisal of Real Estate* at 361. Saunders determined a value of the undevelopable land based on sales of "open space property"

---

[9] Saunders conceded at trial that the landscaping requirements are met without the SROZ and there is no "density transfer" value.

to Metro. However, those properties had a different HBU than the subject property and are not comparable. The court is persuaded that, as of January 1, 2010, the undevelopable land did not contribute any additional value to the overall value of the subject property land.

3.    *Onsite developments* (*OSDs*)

"Land" includes OSDs such as "fill, grading, leveling, underground utilities, underground utility connections and any other elements identified by rule of the Department of Revenue." ORS 307.010(1)(a) ; s*ee also* OAR 150-307.010(2)(a)(A). Glanville testified that appraisers typically include OSDs in the improvements value. He determined that no "adjustment to land value is warranted for OSDs" because they were "installed to serve specific developments [and] are properly embedded in the residual value of those improvements. To value [them] separately would constitute a double assessment." (Ptf's Ex 1 at 105.) He testified that the value of parking space is included in his buildings value; including it as part of the land value would be double-counting. Hill testified that he does not think the OSDs add any value to the subject property.

Saunders testified that the county completes a study each year on the value of OSDs. (Defs' Ex A at 200965.) He testified that OSDs typically range in value from $1.75 to $3.00 per SF, and he selected $2.00 per SF, or $7,466,184, based on the subject property developable land. (*Id.*; Defs' Ex X.) Saunders did not provide the study in his report and does not know how many properties were included in the study. He testified that the study is based on new OSDs, but he did not depreciate his OSDs value. Saunders testified that he did not value the OSDs as if the land were vacant. He testified that OSDs should be valued consistent with the HBU of the subject property, based on the "principle of consistent use, which holds that land cannot be valued based on one use while improvements are valued based on another, [and] must be considered when properties are devoted to temporary, interim uses." *The Appraisal of Real*

*Estate* at 292. He conceded that the current use of the subject property is not "temporary" or "interim." Glanville noted that the subject property site is level and "did not require fill, grading, and leveling, [so] the $7.466 million must be only for the underground utilities." (Ptf's Ex 27 at 4.)

Robinson noted that OSDs are part of every sale and lease of improved property, so the OSDs value is captured in Glanville's improvements value, but there is no way to tell what value he attributed to the OSDs. Given the fact that the county study reflects prices for new OSDs and the lack of information about properties included in the study, the court finds the value of the subject OSDs is at the low end of the range. The court received no reliable evidence as to the depreciation applicable to the OSDs.[10] Based on the evidence presented, the court concludes a value of $1.75 per SF, or $6,500,000, rounded for the subject property OSDs. The court finds that the subject property land RMV, including OSDs, was $19,900,000 as of January 1, 2010.

D.      *Cost Approach*

"The [cost] approach is especially persuasive when land value is well supported and the improvements are new or suffer only minor depreciation and, therefore, approximate the ideal improvement that is the [HBU] of the land as though vacant." *The Appraisal of Real Estate* at 382. Glanville, Hill, and Robinson determined, and the court agrees, that the cost approach should not be given any weight in this analysis. (Ptf's Ex 1 at 91; Defs' Ex A at 201043.)

E.      *Sales Comparison Approach[11]*

"The principle of substitution holds that the value of property tends to be set by the price that would be paid to acquire a substitute property of similar utility and desirability within a

---

[10] OSDs "are subject to physical deterioration and functional obsolescence like buildings and other structures * * *." *The Appraisal of Real Estate*, at 360-61.

[11] For additional discussion of the sales comparison approach, see *Land Value, supra* at 10.

reasonable amount of time." *The Appraisal of Real Estate* at 298-99. "The conclusions of market analysis and [HBU] analysis are fundamental to the sales comparison approach. * * * In addition, an adequately supported determination of the subject property's [HBU] provides the basis for the research and analysis of comparable sales[.]" *Id.* at 299-300. Based on the HBU of the subject property (*see supra* at 8), the court finds that the best comparable sales (comps) for the subject property are single-tenant properties and multi-tenant comps are given no weight.[12]

Glanville testified that the number of potential users for the subject property is limited due to its size. Hill, Glanville, and Robinson agreed that the subject property would be marketed nationally and internationally. Schmachtenberg testified that large, vertically integrated campuses were not desirable as of January 1, 2010, noting that several of Plaintiff's large plants were closed between 2008 and 2010. Gharst testified that he disagrees that large campus layouts are no longer desirable and that large floor plates are a drawback.[13]

   1.   *Glanville's sales comparison approach*

Glanville testified that he identified two comps in Oregon and Washington: E-Tech and SEH America/HP Vancouver, both of which Robinson also considered. (Ptf's Ex 1 at 132; Defs' Ex A at 201049.) Glanville testified that, given limited sales in Oregon and Washington, he also looked nationally for sales and his third comp is the former Pfizer facility in Michigan. (Ptf's Ex 1 at 132-33.) He testified that he talked with the Integra office in Michigan about the sale, but was not able to get details from the parties to the sale; he relied on information from CoStar. The court gives no weight to the Pfizer sale because Glanville was unable to confirm the details

---

[12] "The single user for an industrial building will often pay a different price for the same size building than an investor in a multitenant building. In the application of the sales comparison approach, transactions involving multitenant buildings are unlikely to be comparable to sales of single-user facilities without an adjustment that may be difficult to support." *Appraising Industrial Properties* at 31.

[13] Gharst provided as support a listing for the "Bush Business Park" in Plano, Texas, stating as an amenity "[l]arge floor plates for maximum space utilization (prefect for high-tech companies)." (Def's Ex S.)

of the sale and because of its location in Michigan. Glanville determined a price range of $50 to $55 per SF for the subject property, or $41,600,000 to $45,700,000, rounded. (*Id.* at 138.)

The 176,800 SF "E-Tech" building, located in Hillsboro, sold for $29.13 per SF (gross) on October 5, 2009. (Ptf's Ex 1 at 133.) Glanville testified that he adjusted the price because E-Tech is both newer and smaller than the subject property with a higher percentage of office space than the subject property; he concluded an adjusted sale price of $20.50 per SF. (*Id.*) Robinson determined the E-Tech sale to be a "very low" indicator of value and did not rely on it. (Defs' Ex A at 201061-62.) Glanville testified that E-Tech was not a distress sale because it was exposed to the market; it is better characterized as a "quick sale" based on the limited time on the market. When questioned about his statement that E-Tech was a "[d]istressed sale to partial owner/user," Hill responded that the statement is "accurate" but it might "overstate," noting that the E-Tech property was on the market for a long period of time. (Ptf's Ex 7 at 2.)

Glanville and Hill testified that E-Tech previously sold in January 2007 for $57.98 per SF. (Ptf's Ex 1 at 133; Ex 9.) Hill testified that, according to the broker, the 2007 sale was an investment purchase and the buyer was hoping to find a user for the property and increase its value. He testified that E-Tech was listed for sale in 2009 with an initial asking price of $9.9 million. (Ptf's Ex 9 at 1.) Hill testified that the buyer planned to use E-Tech for semi-conductor processing but needed to make building code upgrades. (*Id.* at 2.)

"When non-typical market conditions of sale are involved in a transaction * * * the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the non-typical market condition." OAR 150-308.205-(D)(3)(c). Conflicting evidence was presented as to whether the E-Tech sale involved "non-typical market conditions." Glanville testified that it was not a distress sale, only a "quick sale," but several reports from

CoStar and others indicate that E-Tech was a distress sale. It appears that E-Tech did not meet building codes. The court finds the E-Tech sale is not a reliable indicator of value.

Glanville testified the "SEH America" property in Vancouver, Washington, is very similar to the subject property and he considers it to be the best comp. (Ptf's Ex 1 at 133, 134-36.) It is a 734,845 SF building built in the 1980s with a greater percentage office space than the subject property; it sold for $66.44 per SF (gross), on June 1, 2009.[14] (*Id.* at 133, 135.) Glanville adjusted the price downward to $53.25 per SF based on the greater percentage office area and smaller "floor area ratio." (*Id.* at 133.) Robinson determined an adjusted price of $62.03 per SF for improvements, which she deemed a "low" indicator of value. (Defs' Ex A at 201049, 201061 (sale 15).) She agreed that SEH America is the most comparable property to the subject property in terms of size; that the mix of uses (but not ratios) is the same; that the age and condition is fairly similar; and that it was a single tenant facility at the time of sale.

"As a condition of the sale," part of SEH America was leased back to the seller, HP. (Ptf's Ex 1 at 135.) Robinson testified that HP offered a portion of the property for lease during the marketing period and that, prior to the sale, HP had prepped the property for another tenant. She testified that HP's lease of the property after the sale created "downward pressure" on the sale price. Robinson's notes state that HP leased back about 300,000 SF and that "Rent Rates not at mkt - a nego deal - below mkt. Did not affect sale price." (Defs' Ex A at 200259.) She testified that HP's agent stated the lease did not affect the sale price, but that SEH America's agent told her the below market rent affected the price. Glanville provided a January 29, 2009, confidential memorandum from HPs broker to HP including an analysis of the SEH America offer. (Ptf's Ex 37.) He testified that the offer was "all cash with no financing"

_____

[14] Robinson reported the sale date as August 2009. (Defs' Ex A at 201049.)

and that HPs broker recommended the sale, noting there were few potential buyers for the property. (*Id.* at 3, 4.) HP agreed to leaseback the property for a term of 24 months. (*See id.* at 2, 3.) Glanville noted that HP projected costs of $1.374 million for separating and securing the leaseback area from the SEH area. (*Id.* at 5.) Defendants noted the broker's sales commission of $605,000. (*Id.* at 4.)

2.      *Robinson's sales comparison approach*

Robinson relied on 15 sales, nine listings, one option, and two purchase offers. (Defs' Ex A at 201049-50.) She ranked her comps "very low," "low," "reasonable," or "high." (*Id.* at 201061.) The average adjusted price of Robinson's "reasonable" comps was $91.16 per SF and the median was $90.45 per SF. (*Id.* at 201062.) She concluded a value of $91.00 per SF, or $75,571,040, for the subject property improvements as of January 1, 2010. (*Id.* at 201063.)

Robinson testified that, of her "reasonable" comps, 6, 7a, and 10a were single tenant at the time of sale. "Sale 6 is the "former Tyco facility," an 84,000 SF property in Salem, that sold for an unadjusted price of $50.00 per SF in September 2007. (Defs' Ex A at 201049, 201053.) Sale 6 "was a shell building - its interior had never been completed and it had never been occupied." (*Id.*) Sale 7a is the South Hill Business and Technology Center," a 625,000 SF property in Puyallup, Washington, that sold for $48 per SF, unadjusted, in October 2007. (*Id.*) Robinson described it as "ten buildings constructed between 1982 and 1997, with data hosting and open ballroom clean rooms totaling over 100,000 SF in three buildings." (*Id.*) "Sale 10a is the January 2008 sale/leaseback of the former Credence Systems campus," a 183,484 SF property in Hillsboro for $109 per SF, unadjusted. (*Id.* at 201040, 20155.) It included two buildings, "the first 100% administrative offices [and] [t]he second * * * a flex building

/ / /

that includes 30% office uses, 25% lab space, 20% clean room space, 10% shipping and 15% warehouse use." (*Id.* at 201055.)

Robinson adjusted each of her comps to remove the land value (based on property tax assessment records) and determined adjusted prices for improvements only. (Defs' Ex A at 201048.) She testified that land values for her comps ranged from $0.33 per SF for sale 7a[15] to $16.25 per SF for sale 12. (*Id.* at 201054, 201060.) Robinson agreed that understating the land value will overstate the improvements value, "all other things being equal." Glanville criticized Robinson's determination of land values, noting "the assessor's land values were inconsistent," even for properties "less than a half-mile apart." (Ptf's Ex 34 at 12.) He conceded that the land values for Robinson's comps could differ as a result of different zoning, but he did not confirm whether that was, in fact, the case. Robinson relied on property tax assessment records, not "actual market transactions," to determine land values. OAR 150-308.205-(D)(3)(c). Her land values varied widely with little explanation as to the disparity.[16] The court finds Robinson's land value adjustments unreliable.

Robinson made upward adjustments sales 6 and 7a for "renovation costs" incurred to convert the properties to multi-tenant.[17] (Defs' Ex A at 201049.) She testified that the addition of "renovation costs" is an "adjustment[] for expenditures made immediately after purchase."[18] Robinson made upward adjustments of 15 percent for "lease up costs" to 6, 7a, and 10a because

---

[15] Robinson testified that she verified with the State of Washington that land values include OSDs.

[16] Robinson testified that the very low land values for 7a and 7b were due, in part, to encumbrances on the land including wetlands, setbacks, and buffers.

[17] Robinson's provided a LoopNet listing and newspaper articles describing capital investments of $45 million for "state-of-the-art Class 'A' facilities and infrastructure." (Defs' Ex A at 200154, 200162, 200179.) Robinson conceded that the renovation costs were incurred to convert to multi-tenant.

[18] "Often the 'transactional' adjustments [including] * * * expenditures made immediately after purchase * * * are made to the total sale price." *The Appraisal of Real Estate* at 309. "The relevant figure is not the actual cost that was incurred but the cost that was anticipated by both the buyer and the seller." *Id.* at 331.

each was "vacant" at the time of sale. (*Id.*) She testified that occupied properties sell for about 15 percent more than vacant properties due to lease-up costs. (*Id.* at 201048.) Glanville criticized Robinson's adjustments for lease up costs and "renovation costs" given the HBU of the subject property. (Ptf's Ex 34 at 12-13, 27-28.) Robinson's adjustments for "lease-up costs" and renovation costs are not adjustments that render her sales 6, 7a, and 10a comparable to the subject property. OAR 150-308.205-(D)(3)(c).

3.      *Market adjustments and sales comparison approach conclusion*

"In a depressed economy, recent sales are often difficult to find. Older sales, occurring prior to the onset of the depressed economy, should be used with great caution because they may not reflect the problems associated with the depressed economy." *The Appraisal of Real Estate*, at 333. Glanville testified that he did not make time adjustments to his sales because each occurred in mid- to late 2009. Robinson made downward adjustments of 10 percent for 2006 and 2007 comps and 15 percent for 2008 comps; they are not cumulative. (Defs' Ex A at 201047.) She testified that it is not possible to make "mathematical derivations" from the CoStar graphs included in her report, but they are helpful to understand "the shape of the market." (*See id.* at 200738.) She testified that, based on LoopNet "Asking Prices for Portland," industrial prices were down one percent for 2006, 9.5 percent for 2007, and 21 percent for 2008. (*Id.* at 200776.) Robinson testified that, based on the CoStar Portland Office report, the "average price per SF" increased 8.7 percent from 2006 to 2007, increased 6.67 percent from 2007 to 2008, and decreased 18.75 percent from 2008 to 2009. (Defs' Ex ZZ at 1.)

The Grubb & Ellis 2010 Portland Forecast states "[t]he average commercial property sales price, based on repeat sales (however few), fell approximately 40 percent from its 2007 peak." (Defs' Ex A at 201107.) Robinson testified that she does not think industrial prices fell

30 to 40 percent from the peak in 2007. Glanville criticized Robinson's time adjustments as unsupported by market evidence. (Ptf's Ex 34 at 4, 14.) The court found Robinson's time adjustments confusing. She provided extensive, detailed notes and excerpts concerning changes in the market from 2006 through 2010, none of which clearly supported her time adjustments.

Based on the evidence presented, the June 2009 SEH America sale is the most reliable comp for the subject property as of January 1, 2010. Glanville made downward adjustments to the SEH America sale based on the greater percentage office area and smaller "floor area ratio," but some evidence presented suggests that the sale price may have been low due to the lease back to HP at "below market rent." The court finds that the SEH America sale indicates a value of $66 per SF, or $54,848,000, rounded, for the subject property as of January 1, 2010. "The sales comparison approach is most useful when a number of similar properties have recently been sold or a currently for sale in the subject property's market." *The Appraisal of Real Estate* at 141. Given few reliable sales, the court gives little weight to the sales comparison approach.

F.  *Income Approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen v. Dept. of Rev.*, 17 OTR 248, 253 (2003) (citations omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income (NOI)." *Id.* "NOI is the currently expected net income of a property after all operating expenses are deducted from gross income." *Id.* at 254 (citations omitted). "When a market rent estimate for the subject property is required[,]" the lease should "represent[] a freely negotiated, arm's-length transaction. A lease that does not meet these criteria, such as a lease to

/ / /

an owner-tenant or a sale-leaseback, may not provide a reliable indication of market rent."
*Appraisal of Real Estate* at 472.

Glanville and Robinson both testified that they did not find any comps with the same or similar mix of spaces as the subject property. Glanville divided the subject property gross "building area into two broad categories: offices and labs, and production areas, warehouse areas, and building systems." (Ptf's Ex 1 at 107.) He determined 519,415 SF of office and lab space, of which 98.1 percent are finished, and 311,616 SF of production, warehouse, and building systems space, of which 24.2 percent are finished. (*Id.*) Glanville stated "[t]he source of our building areas and allocations" was a May 2009 file provided by Plaintiff, which Lessert confirmed "accurately reflected the space usage on January 1, 2010." (*Id.* at 59.) Robinson used net rentable SF and determined the subject property includes: 464,797 SF of "office," 128,485 SF of "office/lab," and 231,280 SF of manufacturing and production space. (Defs' Ex A at 201070.) Noting that Lessert confirmed the accuracy of Glanville's determination, the court accepts Glanville's determination and allocation of the subject property space.

Glanville "eliminate[d] all conventional, multi-story and multi-tenant suburban office buildings from consideration." (Ptf's Ex 1 at 108.) He selected six office and lab comps and five production, warehouse, and building systems comps, and adjusted for free rent and TIs. (*Id.* at 109, 117.) Robinson identified 38 rent comps. (Defs' Ex A at 200108.) She did not adjust for free rent or TIs, stating that TIs, "while often quite substantial, are not a deduction from rents. These costs are typically repaid by the tenant at interest over the first lease period or over the initial term of the lease." (*Id.* at 201074.) Glanville noted that rent concessions were prevalent as of 2010. (Ptf's Ex 34 at 4, 14; *see* Defs' Ex A at 201104.) The court agrees and accepts

Glanville's free rent and TI adjustments as reasonable as of January 1, 2010.[19]  Both Glanville

and Robinson agree that pertinent leases are triple net, or adjusted to triple net.  (Ptf's Ex 1

at 113; Defs' Ex A at 201068.)

1.    *Office and lab rent comparables*

Glanville determined adjusted rates ranging from $6.70 to $7.90 per SF and concluded

$7.75 per SF for the subject property office and lab space.  (Ptf's Ex 1 at 115.)  He testified that

that he did not adjust for class because his comps are class B flex office like the subject property,

but adjusted for "age & quality," "design & features," and "size."  (*Id.* at 113-115.)  Glanville

stated "[r]ental rates are not insensitive to size.  The largest of the [comps] is less than 1/4[th] the

size of the subject [property], and four of the six are less than 1/10[th] the size of the subject."  (*Id.*

at 114.)  Robinson testified that her comps do not support a size adjustment, noting that lease

listing 7b and lease 17 are similar properties except for size and both are about $7.20/SF.

Glanville's rent comps range in year built from 1980-1984 to 2007.  (*Id.* at 109.)

Robinson identified 12 comps for the subject property office space with rates

ranging from $8.04 to $15.40 per SF; four comps (4c, 5b, 14d, and 22) are listings.  (Defs'

Ex A at 200108, 201070.)  She concluded $15.00 per SF for the subject office space and

$9.00 per SF for the office and lab flex space.  (*Id.* at 201070.)  Glanville noted that only two of

Robinson's office comps are more than $15.00 per SF:  comp 19, with effective rent of $9.68 per

SF, and comp 22, with effective rent of $15.00 per SF, an offer for the Adidas Headquarters in

---

[19]  "Extensive [TIs] can influence contract rent or they may be built into the asking rent as a [TI] allowance. * * * Ignoring the impact of TIs in direct capitalization may be a mistake.  Stabilized [NOI] should recognize the [TIs] made to a property that are appropriate for the market. * * * [TIs] are driven by the market - i.e., they are only done if the market dictates it. * * * If the TIs directly impact [NOI] and are recorded above the *NOI* line item in a reconstructed operating statement, they are considered above-the-line expenses.  More often, they are treated as below-the-line expenses." *The Appraisal of Real Estate* at 480.  TIs "that fall outside typical market standards are usually amortized across the lease term.  Accounting for [TI] expenses is difficult when applying direct capitalization." *Appraising Industrial Properties* at 117.

Portland. (Ptf's Ex 34 at 15.) Robinson conceded that, excluding listings, her office and lab flex comps are both below $9.00 per SF.

Glanville comps most similar in size to the subject property are the I-5 Corporate Center in Wilsonville, a single-tenant flex office built in 2007, and the Ronler Corporate Center (Ronler) in Hillsboro, built in 1999. (Ptf's Ex 1 at 109.) The I-5 Corporate Center is 124,450 SF, net rentable, of which 90 percent is flex office finish. (*Id.*) It is leased to Rockwell Collins at $12.89 per SF, triple net; the 10-year lease began in May 2008,[20] and included eight months free rent and TIs of $35 per SF.[21] (*Id.*) Glanville determined rent $9.80 per SF adjusted for free rent and TIs. (*Id.*) Ronler is 70,999 SF of comparable leased space. (*Id.*) The five year lease is a June 2010, renewal at $7.80 per SF, triple net; it did not include free rent or TIs. (*Id.*) Glanville testified that the broker considered the lease to be at market. He concluded $7.80 per SF. (*Id.*)

Robinson's comps most similar in size to the subject property are 12b, 18 (Ronler),[22] 19, 20, and 21. (Defs' Ex A at 200108, 201070.) 12b is the June 2011 lease at $7.95 per SF "shell rate only," of 68,000 SF in the Columbia Center in Vancouver to Hewlett Packard. (*Id.*) Robinson described comp 12b as: "Mix of office and flex engineering space with access to fitness center, conference and athletic facilities, and cafeteria. Space taken as it, tenant putting in own improvements (at $58.82/SF). * * * Term is 10 years, one 5 year renewal * * * ." (*Id.*) Glanville testified that, based on the mix of uses, 12b appears to be a good overall comp for the subject property. Comp 19 is the June 2010 lease of 131,793 SF in "Former In Focus" in Wilsonville to the Oregon Institute of Technology. (Defs' Ex A at 200108.) Robinson described comp 19 as a "[h]igh tech facility lease for use as an engineering school. * * * Lease term 10

---

[20] Glanville testified that he used "year one" rent escalated to January 1, 2010.

[21] Glanville testified that he used $15 per SF TIs amortized because the property was not finished.

[22] Robinson reported the Ronler lease at $8.28 per SF. (Defs' Ex A at 200108, 201070.)

years, option to buy in year 3." (*Id.*) She testified that comp 19 is "Class A flex." Robinson testified that the broker did not indicate that it included free rent. Glanville provided a "lease profile" for comp 19, stating it included 12 months free rent and $25 TIs.[23] (Ptf's Ex 21 at 1.) He testified that the effective rent for comp 19 is $9.68 per SF, accounting for free rent and TIs. (Ptf's Ex 34 at 15.)

Comps 20 and 21 are both "confidential" leases of Tektronix buildings 55 and 56, respectively, in Beaverton; the September 2010 65-month leases are for "office space." (Defs' Ex A at 200108.) Comp 20 is 82,495 SF leased at $9.29 per SF and comp 21 is 106,890 SF leased at $8.04 per SF. (*Id.*) Glanville noted that comps 20 and 21 were both built by Tektronix "and share the 1970s vintage of subject Buildings 60/61 and 63." (Ptf's Ex 34 at 15.)

Glanville two comps most similar in age to the subject property are the Tanasbourne Commerce Center (Tanasbourne) in Hillsboro, and the Scholls Business Center (Scholls) in Tigard. (Ptf's Ex 1 at 109.) Tanasbourne was built 1985-1989 and includes 49,000 SF of comparable leased space out of 133,598 net rentable SF. (*Id.*) The 5.83-year lease was a renewal as of May 2010 at $10.20 per SF, triple net, and ten months free rent. (*Id.*) Glanville determined $6.09 per SF adjusted for free rent and TIs. (*Id.*) Scholls was built 1980-1984 and includes 27,394 SF of comparable leased space out of 357,132 net rentable SF. (*Id.*) Glanville testified that the property is in a park with 16 buildings. (*Id.*) The seven year lease was new as of April 2010, at $10.80 per SF, triple net, including seven months free rent and TIs of $15 per SF. (*Id.*) Glanville determined rent of $7.02 per SF adjusted for free rent and TIs. (*Id.*)

The court gives weight to the comps most similar in size and age to the subject property. The court gives no weight to listings. Robinson's comps, although relied upon in this analysis,

---

[23] The lease was signed in June 2010, but commenced September 1, 2011. (Ptf's Ex 21 at 1, 2; Ex 34 at 15.)

are considered to be at the high end of the range because she did not adjust for rent concessions. The court finds that reasonable lease rates for the subject property office and lab space range from $6.09 to $9.80 per SF, and concludes rent of $8.25 per SF as of January 1, 2010.

2.      *Production, warehouse, building systems*

Glanville identified five comps for the subject property production, warehouse, and building systems space, all located in the Portland Metro area. (Ptf's Ex 1 at 117.) His comps ranged in size from 42,785 to 116,975 SF of leased space, and ranged in age from 1995-1999 to 2009. (*Id.*) Lease dates ranged from June 2009 to May 2010. (*Id.*) As applicable, Glanville adjusted for rent concessions including free rent and TIs; his "shell"[24] rates, adjusted for rent concessions, ranged from $3.29 to $4.09 per SF. (*Id.*) Glanville determined adjusted rents ranging from $3.35 to $3.90 per SF and concluded rent of $3.75 per SF for the subject property production, warehouse, and building systems space. (*Id. at* 123.)

Robinson identified three comps for the subject property manufacturing and distribution space, one of which (15b) is a listing and given no weight. (Defs' Ex A at 200108, 201070.) Comp 16 is the February 2010 three year lease of 123,120 SF in the Bybee Lake Logistics Center in Portland, Oregon, to Owens Corning Insulations Systems LLC, for $3.52 per SF.[25] (*Id.*) Comp 17 is a May 2010 five year "confidential lease" of 15,000 SF in Wilsonville at $7.17 per SF. (*Id.* at 201070.) The property is a "[h]igh tech manufacturing space with 3,015 SF office (20%), entirely AC, small clean room present and operable - installed by prior tenant." (*Id.*) Robinson concluded $4.50 per SF for the subject manufacturing and production space. (*Id.*)

---

[24] Glanville testified that the "shell" rate is for the basic warehouse space and that the "office surcharge" is the amount added to the shell rate; the combined rates are not adjusted and are not comparable to the flex/office rent.

[25] Robinson stated: "[T]enant pays all expenses including a CAM for taxes, insurance, maintenance & property management. Adjustment to NNN terms adds the CAM charges back in: $1.32/SF/year for taxes and insurance, and 5% for structural maint and management." (Defs' Ex A at 200108. Emphasis in original.)

The court finds Glanville's conclusion of $3.75 per SF for the subject property production, warehouse, and buildings systems space to be reasonable.

3.    *Potential gross income (PGI), vacancy and collection loss, expenses, effective gross income, and NOI*

Both Glanville and Robison determined vacancy and collection loss of 10 percent;[26] and the court accepts that rate as reasonable. (Ptf's Ex 1 at 124; Defs' Ex A at 201070-71, 75.) Glanville added to total base rent "expense reimbursements" of $2.00 per SF,[27] or $1,662,062, explaining that, although "operating expenses * * * are assumed to be paid directly by the tenant, an estimate of the annual costs must [be] added to base revenues before subtracting the vacancy and collection loss allowance. Otherwise, [NOI] would be overstated by the amount of the unrecovered expenses during periods of vacancy." (Ptf's Ex 1 at 124-25.) In the *Appraising Industrial Properties* "Case Study," expense reimbursements are added to rental income prior to calculating PGI, but vacancy and collection loss is calculated based on rental income only. *Id.* at 202. The explanation states that "an additional category called 'expense reimbursements' has been included to show the flow of funds." *Id.* at 196. The court finds there is insufficient support for determining vacancy and credit loss based on PGI including expense reimbursements. The court concludes effective gross income of $4,908,500, rounded.

Glanville estimated "non-recoverable expenses," including "structural reserves" at $0.30 per SF (four percent) and management at $0.15 per SF (two percent) for a total of $372,719. (Ptf's Ex 1 at 124-125.) Robison deducted 2.5 percent for reserves for replacement and a property management expense of three percent. (Def's Ex A at 201071, 201075.) The court

---

[26] Robinson's report states "15%," but she corrected at trial. (*See, e.g.*, Defs' Ex A at 201030.)

[27] Glanville's "expense reimbursements" include real property taxes, insurance, exterior and grounds maintenance, interior maintenance and basic janitorial, security, and "basic utility services to maintain acceptable temperature ranges." (Ptf's Ex 1 at 124.)

accepts as reasonable Glanville's "non-recoverable expenses" of $372,719, and concludes NOI

of $4,536,000, rounded, for the subject property as of January 1, 2010.

4. *Capitalization rate (cap rate)*

"Deriving [cap] rates from comparable sales is the preferred technique when
sufficient data on sales of similar, competitive properties is available. * * * [T]he
appraiser must make certain that the [NOI] of each [comp] is calculated and
estimated in the same way that the [NOI] of the subject property is estimated."

*The Appraisal of Real Estate* at 501. Robinson testified that she calculated cap rates based on:

sales 9, 10a, 12, and 15; listings 11b, 14, 10b, and 11c; option to buy 17; and purchase offers 3c

and 21. (Defs' Ex A at 201071-72.) Cap rates for those comps ranged from 3.62 percent for

listing 10b "on the office building," to 16.91 percent for purchase offer 3c. (*Id.*) Robinson

testified that several cap rates were calculated using lease listings. (*See, e g., id.* at 200223-224,

200312, 201072.) Glanville criticized Robinson's use of listings to determine income and her

reliance on listings, offers, and purchase offers as sale prices, noting that cap rates reported for

actual sales are higher than the rates calculated by Robinson. (Ptf's Exs 17, 23, and 34 at 17.)

Robinson's cap rates calculated from her comps are unreliable due to her reliance on listings to

determine NOI and her reliance on listings, options, offers, and sale and leasebacks as sale

prices. She failed "make certain that the [NOI] of each comparable property is calculated and

estimated in the same way that the [NOI] of the subject property is estimated."

Hill testified that, as of January 1, 2010, cap rates ranged from 8.5 to 9.0 percent; he

considered a cap rate in the 9 percent range to be reasonable for the subject property.

Glanville relied on industry publications and surveys, including Korpacz, the American Council

of Life Insurers (ACLI), and Real Capital Analytics (RCA). (Ptf's Ex 1 at 126.) For the

fourth quarter 2009, Korpacz reported overall cap rates of 8.94 percent for "Net Leased

Investments," 9.14 percent in the "National Flex/R&D Market," and 8.75 percent in the

"National Suburban Office Market." (*Id.*) "Over the next two quarters the overall cap rates for the net leased properties and the national flex/R&D market increase slightly to 8.98% and 9.38%, respectively, while the cap rate for the national suburban office market edged down slightly to 8.6%." (*Id.* at 127.) ACLI reported "[t]he overall cap rate for the 65 loans in the 4[th] quarter of 2009 was 8.6% which indicates that cap rates were still increasing at the end of the year." (*Id.* at 128.) Glanville determined a range from 8.5 to 9.0 percent and selected 9.0 percent. (*Id.* at 129.)

Robinson also considered investor surveys, such as "The Boulder Group," which reported cap rates of 8.00 percent and "falling" for "office" properties and 8.25 percent and "falling" for "industrial" properties for the fourth quarter 2009. (Defs' Ex A at 201071-72.) She testified that reserves for replacement were not included in the survey, so the rates are a little low; TIs were not reflected in NOIs or cap rates. Robinson testified that the Boulder Group report reflects single tenant properties and includes national data. Glanville stated that the Boulder Group "reports are based substantially on their transactions which are primarily retail and conventional office buildings. Furthermore * * * the Boulder Group refuses to identify any of the sources for their cap rates, claiming confidentiality." (Ptf's Ex 34 at 17; Ex 18, 19.) Robinson testified that cap rates for the Portland metro area were 8.5 percent as of fourth quarter 2009. (Defs' Ex A at 200738.) She testified that the subject property is an "upper tier asset," but is located in a less desirable suburban market and concluded a cap rate of 8.25 percent. (*Id.* at 201073.)

A question was raised whether survey respondents treat TIs as above or below the line deductions. Gharst and Glanville both testified that they contacted Alex Olson (Olson) who provided the ACLI survey stating: "Report in thousands the stabilized [NOI] of the mortgaged property, after leasing commissions, [TIs], vacancy allowance, operating expenses and property

taxes[.]" (Ptf's Ex 40 at 2.) Gharst testified that Olson sent a follow-up survey to ACLI survey participants inquiring whether they followed instructions with respect to TIs. ALCI has 25 reporters, "all life insurance" companies, of which six responded; four stated that they treated TIs as below-the-line. (Ptf's Ex 39 at 2-3.) Gharst testified that Korpacz did not provide information on how survey respondents treated TIs. Glanville testified that Korpacz survey respondents are "very sophisticated" and would use "effective rents" when reporting cap rates.

"The appraiser must be cognizant of above- and below-the-line expenses when analyzing expense and income data for [comps] so that [NOI] - and the overall [cap] rate derived using that information - is treated consistently for both subject and [comps]." *Appraising Industrial Properties* at 115. "The choice of [cap] rate may account for the influence of [TIs], but the market data used to derive that rate must reflect a similar level of [TIs] in the [comps]." *Id.* at 117. "The respondents to investor opinion surveys, like * * * *Korpacz*[], do not consider * * * [TIs] in the [cap] rates provided * * *." *Id.* at 198. The court is persuaded that Glanville's cap rate of 9.0 percent is overstated based on evidence that survey respondents did not include TIs as above-the-line deductions. The court concludes a cap rate of 8.5 percent for the subject property as of January 1, 2010, for an indicated value under the income approach of $53,364,700, rounded.

G.    *Reconciliation*

In reconciliation, Glanville and Robinson both placed the most weight on the income approach. (Ptf's Ex 1 at 139; Defs' Ex A at 201076.) The court agrees that the income approach should be given the most weight and concludes that the RMV of the subject property as of January 1, 2010, was $53,500,000, with $19,900,000 attributable to the land RMV.

/ / /

III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the 2010-11 real market value of the subject property was $53,500,000, of which $19,900,000 was attributable to the land real market value. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2010-11 real market value of the subject property was $53,500,000.

Dated this _____ day of June 2012.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on June 29, 2012. The Court filed and entered this document on June 29, 2012.*